IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DANIEL SARANCHAK,** | : | **CIVIL NO. 1:CV-05-0317** |
| **Petitioner** | : | |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **JEFFREY BEARD, Commissioner,** | : | |
| **Pennsylvania Department** | : | |
| **of Corrections;** | : | |
| **DAVID DiGUGLIELMO,** | : | **THIS IS A CAPITAL CASE** |
| **Superintendent of the State** | : | |
| **Correctional Institution at** | : | |
| **Graterford; and FRANK TENNIS,** | : | |
| **Superintendent of** | : | |
| **the State Correctional Institution** | : | |
| **at Rockview,** | : | |
| | : | |
| **Respondents** | : | |

_____   **MEMORANDUM**

Before the court is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed by petitioner Daniel Saranchak ("Saranchak"), a Pennsylvania inmate sentenced to death by a jury in the Court of Common Pleas for Schuylkill County, Pennsylvania, for murdering his grandmother and uncle. For the reasons that follow, the petition will be granted in part and leave will be given to the Commonwealth to conduct a new guilt phase hearing and sentencing hearing.

I.   **Facts and Procedural History**

On September 1, 1994, before Judge Cyrus Palmer Dolbin of the Court of Common Pleas for Schuylkill County ("trial court"), Saranchak pleaded guilty to two counts of criminal homicide generally, and waived a trial by jury for those counts and the related charges of burglary, aggravated assault, robbery, theft by

unlawful taking, and conspiracy.[1]  The non-jury degree of guilt phase of

Saranchak's trial commenced on September 6, 1994, with Kent Watkins, Esquire

("trial counsel" or "Attorney Watkins"), appointed to represent Saranchak. The

Pennsylvania Supreme Court summarized the evidence presented at the degree of

guilt phase as follows:

> On October 15, 1993, Daniel Saranchak . . . was drinking with a
> friend, Roy Miles (Miles), at Mickey Courtney's Sportsman Bar
> (Courtney's Bar) in Pottsville, Pennsylvania. [Saranchak] told Miles
> that he knew where they could acquire some money, but that they
> might have to kill someone to obtain it.  Thereafter, the two men left
> the bar and went to [Saranchak's] brother's house. [Saranchak]
> obtained a .22 caliber rifle from his brother, feigning that he and
> Miles were going hunting.  After leaving his brother's house,
> [Saranchak] and Miles went to a second bar and purchased two quarts
> of beer before driving to a residence in Cumbola, Pennsylvania (the
> Residence) shared by [Saranchak's] 87-year-old grandmother
> (Grandmother) and his uncle, Edmund Saranchak (Uncle).
>
> Before entering the Residence, [Saranchak] stated that he was going
> to get some money from Grandmother. [Saranchak] and Miles entered
> the Residence through an unlocked basement door.  Once inside,
> [Saranchak] walked directly to the sofa in the basement and shot
> Uncle in the head killing him almost instantly. [Saranchak] rolled
> Uncle over, while Miles rifled through the victim's pockets stealing
> his money. [Saranchak] and Miles then went to Grandmother's
> second floor bedroom. [Saranchak] asked Miles to shoot
> Grandmother, but he refused.  Upon awakening, Grandmother asked,
> "Danny is that you?" [Saranchak] then fatally shot Grandmother once
> in the head. [Saranchak] and Miles proceeded to lower the bedroom's
> blinds and search Grandmother's room for money.  They eventually
> stole some money from Grandmother's purse.[2]
>
> Uncle had a breakfast meeting scheduled with his employer for the
> next morning.  When Uncle failed to appear, his employer went to his
> home and spoke with a neighbor, who indicated he had not seen
> either victim since the previous day.  Employer and the neighbor
> decided to enter the home, and upon doing so discovered Uncle's
> body.  They called the police, who responded and found
> Grandmother's body.  After securing the crime scene, police
> canvassed the neighborhood and questioned neighbors.  Based upon
> the information obtained, police interviewed [Saranchak's] mother
> who, among other things, told the police that [Saranchak] had "gone

---

[1] *See* 18 Pa. Cons. Stat. §§ 2501, 3502(a), 2702, 3701, 3921, and 903, respectively.

[2] [Saranchak] and Miles also found a locked safe, but were unable to open it.

shooting" the night before.  She also informed police where [Saranchak] was residing.  Based upon mother's information, the police obtained a search warrant for [Saranchak's] apartment and seized a .22 caliber rifle.[3]

On October 16, 1993, [Saranchak] was taken into custody, transported to a local police station and twice advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  He confessed to killing Uncle, but denied killing Grandmother.[4]

*Commonwealth v. Saranchak*, 866 A.2d 292, 295-96 (Pa. 2005) ("*Saranchak-5*").

The trial court convicted Saranchak on each charge of first-degree murder, *see* 18 Pa. Cons. Stat. § 2502(a), and all related charges.  Approximately a week after the guilty verdicts, Saranchak's trial proceeded to the penalty phase.  After the parties selected a jury on September 12, 1994, the penalty phase commenced on September 15, 1994.  On September 16, 1994, the jury sentenced Saranchak to death on each conviction of first-degree murder.  In doing so, the jury found two aggravating circumstances on each count of murder: 1) that the killing was committed during the perpetration of a felony, and 2) that Saranchak was convicted of another murder committed either before or at the time of the offense.  The jury found no mitigating circumstances.[5]

Saranchak, still represented by Watkins, timely filed an appeal to the Supreme Court of Pennsylvania.  On April 24, 1996, the court affirmed Saranchak's convictions and sentences.  *Commonwealth v. Saranchak*, 675 A.2d

---

[3] Later testing established that the casings found adjacent to both victims' bodies were fired from that weapon.

[4] At some point after his arrest, [Saranchak] also confessed both murders to a Schuylkill Children and Youth Services (CYS) caseworker involved with his children.

[5] The significance of the jury's finding no mitigating circumstances is that where at least one aggravating circumstance is present and no mitigating circumstances are found, the jury is required to return a verdict of death in a first-degree murder sentencing hearing.  *See* 42 Pa. Cons. Stat. Ann. § 9711(c)(1)(iv); *Commonwealth v. Rolan*, 549 A.2d 553, 560 n.7 (Pa. 1988).

268 (Pa. 1996) ("*Saranchak-1*").  Saranchak subsequently filed a *pro se* petition with the trial court seeking collateral relief under the Pennsylvania Post-Conviction Relief Act, 42 Pa. Cons. Stat. §§ 9541-46 ("PCRA").  Robert E. Kurtz, Esquire, was appointed by the court to represent Saranchak.  On May 28, 1997, the PCRA court (Judge Dolbin presiding) dismissed the petition without a hearing for lack of merit.  Saranchak timely filed an appeal with the Pennsylvania Supreme Court on June 26, 1997.  On November 8, 1999, the Pennsylvania Supreme Court issued a *per curiam* order vacating the denial of post-conviction relief and remanding for the filing of an amended petition.  *Commonwealth v. Saranchak*, 739 A.2d 162 (Pa. 1999) ("*Saranchak-2*").

The Defender Association of Philadelphia ("Defender Association") was appointed as new counsel, and, on December 7, 1999, filed an amended PCRA petition.  However, during the proceedings on the amended petition, Saranchak wrote to the PCRA court expressing his desire to discharge the Defender Association and forego any further legal proceedings.  After a thorough colloquy but without providing for a competency evaluation, the PCRA court accepted the waiver and dismissed the amended petition on July 31, 2000.

The Defender Association appealed the decision of the PCRA court to the Pennsylvania Supreme Court, asserting that the waiver was invalid because no competency hearing had been conducted.  While the appeal was pending, then-Governor of Pennsylvania Thomas Ridge signed a warrant, scheduling Saranchak's execution for November 8, 2000.  The Defender Association, on behalf of Saranchak, then requested a stay of execution from the Pennsylvania Supreme Court.

In response to that request, on October 25, 2000, the Pennsylvania Supreme Court remanded the case to the PCRA court for a competency evaluation.  At the

4

direction of the PCRA court, Larry A. Rotenberg, M.D., Director of Psychiatry at the Reading Hospital and Medical Center, conducted a psychiatric evaluation of Saranchak and submitted a report.  On November 3, 2000, the PCRA court held a hearing, and Dr. Rotenberg testified that Saranchak was competent and had the requisite ability to knowingly waive all further legal proceedings.  The PCRA court accepted Dr. Rotenberg's testimony and found Saranchak competent to waive his appeals.  On November 6, 2000, the Pennsylvania Supreme Court issued orders dismissing the appeal and denying the stay of execution.  The court also found the Defender Association lacked standing to appeal on behalf of Saranchak.

On November 7, 2000, the Defender Association filed a next-friend petition seeking a stay of execution in federal court.  This court held an emergency hearing on November 8, 2000, found that the next-friend lacked standing, and denied the request for a stay of execution.  *Saranchak v. Horn*, No. 1:CV-00-1948, Order (M.D. Pa. Nov. 8, 2000).

The Defender Association immediately appealed to the United States Court of Appeals for the Third Circuit, which entered a stay of Saranchak's execution. *Saranchak v. Horn*, No. 00-9009, Order (3d Cir. Nov. 8, 2000).  The Commonwealth filed a motion to vacate the stay of execution in the United States Supreme Court.  During the pendency of that motion, the Defender Association filed a second request for a stay of execution with the Pennsylvania Supreme Court, citing the Third Circuit's grant of the stay and submitting a signed declaration from Saranchak indicating his desire to retract his previous waiver of appellate rights.  Before the Pennsylvania Supreme Court acted upon this request, the United States Supreme Court denied the Commonwealth's application to

vacate the Third Circuit's stay of execution. *Horn v. Saranchak ex rel. Troup*, 531 U.S. 986 (2000).[6]

On November 20, 2000, Saranchak filed a motion for reargument in the Pennsylvania Supreme Court seeking reinstatement of the Defender Association as his counsel, the grant of a number of newly presented post-conviction rights, and a remand of the proceedings to the PCRA court for full consideration of his amended PCRA petition. On February 7, 2000, the Pennsylvania Supreme Court retained jurisdiction and ordered the PCRA court to conduct a colloquy with Saranchak to determine whether he had, indeed, changed his mind regarding representation and his desire to pursue PCRA claims. *Commonwealth v. Saranchak*, 767 A.2d 541 (Pa. 2001) ("*Saranchak-3*"). At the colloquy, Saranchak stated that he wished to pursue arguments raised in his PCRA petition and sought representation by the Defender Association. Based on that colloquy and further record made before the PCRA court, the Pennsylvania Supreme Court granted Saranchak's application for reargument and reinstated the amended PCRA petition. *Commonwealth v. Saranchak*, 810 A.2d 1197 (Pa. 2002) ("*Saranchak-4*").

Following remand, the PCRA court (Judge Dolbin again presiding) held an evidentiary hearing on February 11 and 19, 2003. Following the hearing, the PCRA court issued a decision denying Saranchak relief on all claims.[7] Saranchak timely filed an appeal to the Pennsylvania Supreme Court. In a 5-2 decision, the court affirmed the denial of PCRA relief. *Saranchak-5*.

---

[6] The Third Circuit subsequently stayed further proceedings pending rulings from the state court on Saranchak's motion for reargument and reinstatement of his PCRA petition.

[7] As a result of this action in the state court, the Third Circuit dismissed the still-pending petition seeking a stay of execution on June 13, 2003.

After the Pennsylvania Supreme Court denied PCRA relief, Saranchak filed the instant Petition for Writ of Habeas Corpus (Doc. 7) in this court.  Respondents responded to the petition on January 17, 2006.  (Doc. 22.)  This matter is now ripe for disposition.

## II.    Reviewability of Claims

A habeas corpus petition pursuant to 28 U.S.C. § 2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement. *Preiser v. Rodriguez*, 411 U.S. 475, 498-99 (1973).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Rather, federal habeas review is restricted to claims based "on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67-68; *see also Johnson v. Rosemeyer*, 117 F.3d 104 (3d Cir. 1997).

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), went into effect and amended the standards for reviewing state court judgments in federal habeas petitions filed under § 2254.  Because Saranchak filed his petition on June 16, 2005, after the effective date of AEDPA, the court is required to apply the amended standards to his claims for federal habeas corpus relief.  *See Werts v. Vaughn*, 228 F.3d 178, 195 (3d Cir. 2000) (citing *Lindh v. Murphy*, 521 U.S. 320, 336 (1997)).

Before a court may review a § 2254 petition, the petitioner must demonstrate exhaustion of state court remedies and lack of procedural default.[8] Only then may the court examine the merits of the petition.

## A.    Exhaustion of State Court Remedies

Under AEDPA, a federal court cannot consider a writ of habeas corpus unless the petitioner has first exhausted all state court remedies.  § 2254(b)(1). The exhaustion requirement ensures that state courts have the first opportunity to review federal constitutional challenges to state convictions and preserves the role of the state courts in protecting federally guaranteed rights.  *Caswell v. Ryan*, 953 F.2d 853, 857 (3d Cir. 1992) (citing *Braden v. 30th Judicial Cir. Ct. of Ky.*, 410 U.S. 484, 490-91 (1973)).

To satisfy the exhaustion requirement, a petitioner must demonstrate that he "fairly presented" to the state courts every claim alleged in the federal petition, including the highest state court in which the petitioner was entitled to review. *Whitney v. Horn*, 280 F.3d 240, 250 (3d Cir. 2002).  A claim is "fairly presented" if the petitioner presents the federal claim's "factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted."  *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).  As long as the state court is given the opportunity to address the claim, it is exhausted, even if

---

[8] 28 U.S.C. § 2254(b)(1) provides the following:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
        (A) the applicant has exhausted the remedies available in the courts of the State; or
        (B)(i) there is an absence of available State corrective process; or
        (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

the state court refuses to hear the claim because it is time-barred or waived. *Pursell v. Horn*, 187 F. Supp. 2d 260, 288-89 (W.D. Pa. 2002) (citing *Bond v. Fulcomer*, 864 F.2d 306, 309 (3d Cir. 1989) (holding that presentation of an untimely petition to the state's highest court satisfied the exhaustion requirement)); *see also Laird v. Horn*, 159 F. Supp. 2d 58, 91 (E.D. Pa 2001) (concluding that petitioner had exhausted claim where it was presented to the Pennsylvania Supreme Court on PCRA review and rejected on grounds of waiver).

Saranchak has satisfied the exhaustion requirement in this case. Each of Saranchak's eleven claims was presented to the state courts, almost verbatim, in his petition for post-conviction relief, except for his eighth claim that he was denied a fair and impartial jury. The eighth claim was addressed by the Pennsylvania Supreme Court on direct appeal. *See Saranchak-1*, 675 A.2d at 274. Even if the Pennsylvania Supreme Court did not reach the merits of every one of his PCRA claims, the claims were properly exhausted because the court was fairly given the opportunity to address them.

## B.   Procedural Default

In the event that a state court declines to consider a petitioner's federal claim and rests its decision to abstain on an "independent and adequate" state procedural rule, a petitioner's claim will be deemed in procedural default and a federal court may not evaluate it on the merits. *Wainwright v. Sykes*, 433 U.S. 72, 81, 86-87 (1977); *see generally Harris v. Reed*, 489 U.S. 255, 262-63 (1989). If, however, a petitioner's federal claim is defaulted by a state procedural rule that is not "independent" of federal law or otherwise "adequate," the federal court may proceed to consider the merits of the claim. Furthermore, a federal habeas court may always review the merits of a defaulted claim if the petitioner can establish "cause and prejudice" or a "fundamental miscarriage of justice" to excuse the

procedural default. *Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir. 2002) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

In determining whether a state procedural rule is "adequate," the reviewing court must determine whether the rule was "firmly established and regularly followed" at the time the alleged procedural default occurred. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (citing *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)). The relevant inquiry is whether the procedural rule was applied in a "consistent and regular" manner in the "vast majority of cases" at the time the alleged default occurred. *Doctor v. Walters*, 96 F.3d 675, 684 (3d Cir. 1996) (citing *Dugger v. Adams*, 489 U.S. 401, 410 n.6 (1989)).

The procedural elements of the PCRA exclude waived issues from the class of cognizable PCRA claims. 42 Pa. Cons. Stat. § 9543(a)(3). However, between 1978 and 1998, it was the practice of the Pennsylvania Supreme Court to apply a relaxed waiver doctrine in capital cases. *Pursell*, 187 F. Supp. 2d at 293-94; *Laird*, 159 F. Supp. 2d at 74-75; *Commonwealth v. Albrecht*, 720 A.2d 693, 700 (Pa. 1998). Under the relaxed waiver doctrine, the Pennsylvania Supreme Court reviewed the merits of all claims raised in capital cases, whether on direct appeal or in post-conviction proceedings, regardless of any waiver by the defendant.[9]

---

[9] The Pennsylvania Supreme Court applied the relaxed waiver doctrine in dozens of capital cases between 1978 and 1998. *See, e.g.*, *Commonwealth v. Brown*, 711 A.2d 444, 455 (Pa. 1998) ("This Court generally applies a relaxed waiver rule in capital cases because of the permanent and irrevocable nature of the death penalty"); *Commonwealth v. Morales*, 701 A.2d 516, 520 n.13 (Pa. 1997) ("[T]his Court's practice has been to address all waived issues which have been raised in PCRA death penalty petitions"); *Commonwealth v. Morris*, 684 A.2d 1037, 1042 n.11 (Pa. 1996) ("While we agree that some of the issues presented . . . could be deemed waived pursuant to the PCRA, we will nevertheless address all of the Appellant's claims . . . because it is this Court's practice to address all issues arising in a death penalty case irrespective of a finding of waiver"); *Commonwealth v. DeHart*, 650 A.2d 38, 48 (Pa. 1994) ("Although Appellant concedes that this issue is technically waived because it was not previously raised below, we will nonetheless address it because we have not been strict in applying our waiver

This practice was so well-established that, in 1997, the United States Court of Appeals for the Third Circuit concluded that the Pennsylvania Supreme Court had a "practice of reaching the merits of claims in PCRA petitions in capital cases regardless of the failure of the petition to meet the appropriate procedural criteria." *Banks v. Horn*, 126 F.3d 206, 214 (3d Cir. 1997).  It was not until 1998 that the Pennsylvania Supreme Court, in *Albrecht*, 720 A.2d at 700, announced that it was ending its "practice" of declining to apply waiver principles in PCRA appeals pursuant to the relaxed waiver doctrine.[10]

At the time of Saranchak's direct appeal in 1996, the Pennsylvania Supreme Court applied the relaxed waiver doctrine in capital post-conviction appeals.  This more relaxed standard permitted review of all capital claims, even those not raised on direct appeal.  As a result, any alleged procedural default which may have occurred in this case is not an adequate bar to federal habeas review in Saranchak's claims.  In this case, the parties agree that there are no claims in procedural default.

### C.   Standard of Review for Claims Under 28 U.S.C. § 2254

Once it has been demonstrated that the habeas claims have been exhausted and are not in procedural default, a federal court may reach the merits of a habeas corpus petition. AEDPA restricts a federal court's authority to grant relief when a

---

rules in death penalty cases"); *Commonwealth v. Abu-Jamal*, 555 A.2d 846, 854 (Pa. 1989) (same).  For more Pennsylvania Supreme Court cases applying the doctrine of relaxed waiver, see Louis M. Natali, *New Bars in Pennsylvania Capital Post-Conviction Law and Their Implications for Federal Habeas Corpus Review*, 73 Temp. L. Rev. 69, 121 n.147 (2000).

[10] In *Albrecht*, the Pennsylvania Supreme Court found that there were adequate safeguards to ensure the fairness of verdicts in capital cases, that the relaxed waiver doctrine impeded the goal of finality of judgments, and consequently held that: "Henceforth, a PCRA petitioner's waiver will only be excused upon a demonstration of ineffectiveness of counsel in waiving the issue."  720 A.2d at 700.

state court has previously considered and rejected the petitioner's federal

constitutional claims on the merits.  § 2254(d).  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

### 1.  Contrary to or an Unreasonable Application of Federal Law

_____The United States Supreme Court interpreted the standard set forth in §

2254(d)(1) for the first time in *Williams v. Taylor*, 529 U.S. 362 (2000).  First, it

instructed that the federal court must decide exactly what constitutes the

applicable clearly established law determined by the Supreme Court.  *Id.* at 389-

91; *see also Hameen v. State of Delaware*, 212 F.3d 226, 235 (3d Cir. 2000).

Second, the court must determine whether the state court's decision was "contrary

to" or "an unreasonable application of" that law.  28 U.S.C. § 2254(d)(1).  Further,

the Third Circuit has held that a federal court's analysis of whether a state court's

decision is "contrary to" or an "unreasonable application of" Supreme Court

precedent under § 2254(d) may be amplified by decisions of inferior federal courts

evaluating that Supreme Court precedent.  *Hardcastle v. Horn*, 368 F.3d 246, 256

n.3 (3d Cir. 2004) (citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 890

(3d Cir. 1999)).

In *Williams*, the Supreme Court also explained that the two clauses of §

2254(d)(1) have independent meaning.  Addressing "contrary to" first, the Court

stated: "[A] state-court decision will certainly be contrary to our clearly

established precedent if the state court applies a rule that contradicts the governing

law set forth in our cases . . .[or] if the state court confronts a set of facts that are

materially indistinguishable from a decision of this Court and nevertheless arrives

at a result different from our precedent." *Williams*, 529 U.S. at 405-06. "[A] run-

of-the-mill state-court decision applying the correct legal rule from [Supreme

Court] cases to the facts of a prisoner's case [does] not fit comfortably within §

2254(d)(1)'s 'contrary to' clause." *Id.* at 406.

The Supreme Court then addressed the "unreasonable application" clause of

§ 2254(d)(1). It stated that the "unreasonable application" clause permits a federal

habeas court to "grant the writ if the state court identifies the correct governing

legal principle from this Court's decision but unreasonably applies that principle

to the facts" of the petitioner's case. *Id.* at 413. Stated otherwise, a state court

decision is an unreasonable application under § 2254(d)(1) if the state court

> identifies the correct governing legal rule from the Supreme Court's
> cases but unreasonably applies it to the facts of the particular case or
> if the state court either unreasonably extends a legal principle from
> the Supreme Court's precedent to a new context where it should not
> apply or unreasonably refuses to extend that principle to a new
> context where it should apply.

*Gattis v. Snyder*, 278 F.3d 222, 228 (3d Cir. 2002). "The unreasonable application

test is an objective one – a federal court may not grant habeas relief merely

because it concludes that the state court applied federal law erroneously or

incorrectly." *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005). In that respect, "an

*unreasonable* application of federal law is different from an *incorrect* application

of federal law." *Williams*, 529 U.S. at 410 (emphasis in original).

## 2.    Unreasonable Determination of Facts

A federal court may also grant relief under § 2254(d)(2), where the state

court based its decision on an "unreasonable determination of the facts in light of

the evidence presented in the State court proceedings." A different provision of

AEDPA, § 2254(e)(1), also addresses the weight of a state court determination of a factual issue. That section reads,

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). The relationship between § 2254(d)(2)'s reference to an "unreasonable determination of the facts" and § 2254(e)(1)'s "presumption of correctness" is not necessarily clear and has caused some debate within the courts.

The Supreme Court shed some light on the debate in *Miller-El v. Cockrell*, 537 U.S. 322 (2003). In *Miller-El*, the Court described the relationship between § 2254(d)(2) and § 2254(e)(1) as follows: "The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions." *Id.* By way of example of this distinction, a district court would review under § 2254(e)(1) a state court's factual determinations made based on the evidence presented, but not the state court's legal decision made based on those factual determinations. In such a distinction, the Court rejected the Fifth Circuit's position that, in order to be entitled to relief under § 2254(d)(2), a petitioner must "prove that the state-court decision was objectively unreasonable by clear and convincing evidence." *Id*. at 341. The Supreme Court called this standard "too demanding . . . on more than one level." *Id*. Thus, in order to grant relief under § 2254(d)(2), this court must find that the state court's *decision* was based on an unreasonable determination of the facts in light of the evidence presented. However, the state court's *decision* is not subject to the clear and convincing evidence standard. As explained in *Miller-El*, although § 2254(e)(1) adds another layer of review to factual determinations,

14

requiring that they be presumed correct absent "clear and convincing evidence" to the contrary, that standard is not insurmountable. The Supreme Court stated,

> [e]ven in the context of federal habeas, deference does not imply the abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Miller-El*, 537 U.S. at 340; *see also Wiggins v. Smith*, 539 U.S. 510, 528 (2003) (rejecting state court's factual determination under § 2254(e)(1) and § 2254(d)(2)).

On the other hand, a federal court must assess the reasonableness of the state court's factual determinations through the lens of § 2254(e)(1) which, as stated above, requires federal courts to apply a presumption of correctness to factual determinations made by the state court.[11] A petitioner may only overcome this presumption only with clear and convincing evidence of the state court's error. *Miller-El*, 537 U.S. at 341; *Matteo*, 171 F.3d at 888; *Thomas v. Varner*, 428 F.3d 492, 497-98 (3d Cir. 2005). Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." *Mastracchio v. Vose*, 274 F.3d 590, 597-98 (1st Cir. 2001).

Similar to the "unreasonable application" prong of § 2254(d)(1), a factual determination should be adjudged "unreasonable" under § 2254(d)(2) only if the court finds that a rational jurist could not reach the same finding on the basis of the evidence in the record. § 2254(d)(2); *Porter v. Horn*, 276 F. Supp. 2d 278, 296 (E.D. Pa. 2003); *see also Torres v. Prunty*, 223 F.3d 1103, 1107-08 (9th Cir. 2000); *cf. Jackson v. Virginia*, 443 U.S. 307, 316 (1979). "This provision essentially requires the district court to step into the shoes of an appellate tribunal, examining the record below to ascertain whether sufficient evidence existed to

---

[11] This presumption applies to factual determinations of both state trial and appellate courts. *See Dickerson v. Vaughn*, 90 F.3d 87, 90 (3d Cir. 1996).

support the findings of fact material to the conviction." *Breighner v. Chesney*, 301 F. Supp. 2d 354, 364 (M.D. Pa. 2004) (citing 28 U.S.C. § 2254(d)(2) and (f)[12] ). Mere disagreement with an inferential leap or credibility judgment of the state court is insufficient to permit relief. *Porter*, 276 F. Supp. 2d at 296; *see also Williams*, 529 U.S. at 408-09. Only when the finding lacks evidentiary support in the state court record or is plainly controverted by evidence therein should the federal habeas court overturn a state court's factual determination. *Porter*, 276 F. Supp. 2d at 296; *see also Williams*, 529 U.S. at 408-09.

### 3.    Adjudication on the Merits

Section 2254(d) does not necessarily apply to all cases that otherwise fall within AEDPA's reach. The introductory sentence of § 2254(d) explicitly limits its application to only those claims that were "adjudicated on the merits in State court proceedings." § 2254(d). An "adjudication on the merits" has a well-settled meaning: "a decision finally resolving that parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 235 (5th Cir. 2002) ("adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to procedural"). When the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential AEDPA standards do not apply, and the federal court must exercise *de novo* review over pure legal questions and mixed questions of law and fact. *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) (citing *McCandless,* 172 F.3d at 260). The court must still

---

[12] "If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination." § 2254(f).

presume, however, that the state court's factual determinations are correct, although this presumption "is rebuttable upon a showing of clear and convincing evidence." *Id.* (citing § 2254(e)(1)).

## III.   Discussion

Saranchak's petition for writ of habeas corpus pursuant to § 2254 contains eleven (11) claims for relief, the majority of which allege ineffective assistance of counsel.   Overall, the ineffectiveness of counsel claims are grouped by failure to investigate and failure to litigate.   Specifically, Saranchak argues that his counsel was ineffective (1) in failing to conduct a constitutionally adequate investigation of the diminished capacity defense; (2) in failing to object to and to litigate suppression issues with respect to a waiver of Saranchak's *Miranda* rights; and (3) in failing to litigate the issues related to Saranchak's alleged statement made to a Child and Youth Services caseworker.[13]   For purposes of analysis, the court will first review Saranchak's claim of ineffectiveness of counsel for failing to investigate mental health evidence in support of a diminished capacity defense. Following this review, the court will consider, cumulatively, counsel's further alleged errors in failing to litigate certain issues at both phases of the proceedings. Upon this review, the court concludes that Saranchak has established (1) that trial counsel's errors, considered cumulatively, amounted to constitutional ineffectiveness, and (2) that Saranchak was prejudiced by those errors.   Thus, Saranchak is entitled to relief on those claims.[14]

---

[13] Saranchak also argues that his counsel was ineffective in failing to object to and failing to move to strike the testimony of Saranchak's alleged accomplice.  In light of the disposition of the issues discussed herein, the court need not address this issue.

[14] Saranchak raised seven additional issues in his habeas petition:

V.  Mr. Saranchak was denied effective assistance of counsel at capital

The Sixth Amendment guarantees an accused in a criminal prosecution the right to assistance of counsel for his defense.  The applicable federal precedent for ineffective assistance claims is the well-settled two-prong test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *See also Wiggins*, 539 U.S. at 521(setting out the *Strickland* test); *Williams*, 529 U.S. at 390-91 (same).  The first prong of the *Strickland* test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning

---

sentencing.

VI.  The trial court unconstitutionally deprived Petitioner of the use of a mental health expert; prior counsel were ineffective for failing to object and litigate this claim.

VII.  The trial court erred in failing to instruct the jury on the mitigating circumstance of extreme mental or emotional disturbance; defense counsel was ineffective for failing to object or request an appropriate instruction, and for failing to raise this claim on appeal.

VIII.  Petitioner was denied his constitutional rights when the trial court improperly excused prospective jurors based upon their views concerning the death penalty.

IX.  The trial court's instructions on the nature of aggravating and mitigating circumstances unconstitutionally prevented the jury from considering and giving full effect to relevant mitigating evidence and all prior counsel were ineffective for failing to object to the instructions or otherwise raise this issue.

X.  Petitioner was denied his constitutional rights to due process, to a fair and impartial penalty phase, to the effective assistance of counsel, and against cruel and unusual punishment, when the prosecutor engaged in improper argument, where defense counsel failed to object at trial or raise the issue on appeal, and where the court took no action to cure the error.

XI.  Petitioner is entitled to relief from his conviction and sentence because of the cumulative effect of the errors described in this petition and found in prior proceedings.

(Doc. 7 at 4-5.)  Claims VI and XI are duplicative of claims discussed herein, thus will not be addressed directly.  In addition, the court's disposition of the claims discussed herein and the conclusion that a writ of habeas corpus is issued with respect to the relevant degree of guilt phase claims renders it unnecessary to address the remaining sentencing-phase claims (Claims V, VII-X); any relief Saranchak could obtain on those claims would be cumulative.

as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 521.  It follows that when a petitioner claims that his counsel failed to raise a claim that the court determines to be meritless, habeas relief under *Strickland* is not available.  *See Strickland*, 466 U.S. at 691 (failure to pursue "fruitless" claims "may not be challenged as unreasonable.")  A court must indulge a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;" that is, the petitioner must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy."  *Id.* at 688-89, 690-92.  The question is not whether counsel did not err, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place of counsel's conduct. *Id.*

The second prong of *Strickland* requires a petitioner to show that "the deficient performance prejudiced the defense."  *Id*. at 687.  To prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*. at 694.  This standard "is not a stringent one;" it is less demanding than the preponderance standard.  *Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999).

Further, the reviewing court must evaluate counsel's performance in light of the totality of the evidence. *Strickland*, 466 U.S. at 695-96; *see also Jacobs*, 395 F.3d at 106-07.  It is the petitioner's burden to establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim.  *Strickland*, 466 U.S. at 697; *see also Jacobs*, 395 F.3d at 102.

At the time the state courts reviewed the claims that Saranchak's counsel was ineffective, *Strickland*'s familiar two-pronged test was the "clearly established federal law" applicable to ineffective assistance of counsel claims. Under Pennsylvania state jurisprudence, a three-prong test is applied to ineffective assistance of counsel claims, but is, in substance, identical to the *Strickland* test. *See, e.g.*, *Commonwealth v. Pierce*, 527 A.2d 973, 975-77 (Pa. 1987). The Third Circuit Court has held that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to *Strickland*. *Jacobs v. Horn*, 395 F.3d 92, 107 n.9 (3d Cir. 2005); *Werts v. Vaughn*, 228 F.3d 178, 204 (3d Cir. 2000). Thus, under § 2254(d)(1), the relevant inquiry in assessing ineffectiveness claims that have been adjudicated on the merits is whether the state court's decision involved an unreasonable application of *Strickland*. *Jacobs*, 395 F.3d at 107 n.9; *Werts*, 228 F.3d at 204.

### A.     Failure to Investigate Mental Health Evidence in Support of Diminished Capacity Defense

Saranchak contends that he is entitled to a new trial because he received ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights when Attorney Watkins failed to investigate, develop and present mental health evidence in support of a diminished capacity defense to the charges of first degree murder.[15]

In support of this claim, Saranchak contends that Attorney Watkins failed to investigate or obtain certain types of information related to Saranchak's mental health and history of chronic alcoholism to support a diminished capacity defense. Specifically, Saranchak identifies the following information: (1) expert testimony detailing Saranchak's mental health problems and chronic alcohol abuse; (2)

---

[15] For a discussion of Pennsylvania's diminished capacity defense, see *infra* pp. 35-38.

complete school and hospital records detailing Saranchak's history of mental health problems; and (3) information from Saranchak's probation officer, teachers, stepfather, and two half-brothers detailing Saranchak's socially and emotionally disturbed childhood, medical history, and personality disorder due to alcohol abuse.  Saranchak also contends that had his counsel properly used and developed this information, the defense would have had available to it expert mental health testimony that would have established that he was suffering from psychotic effects of alcohol at the time of the offenses.  Further, he contends that had this evidence been presented at the guilt phase, there is a reasonable probability that the trial court would have found Saranchak guilty of third degree murder rather than first degree murder.

In reviewing this claim, the court will apply § 2254(d) to the state court's analysis of both prongs of the ineffective assistance of counsel standard.  The Pennsylvania supreme court addressed only *Strickland*'s prejudice prong,[16]

---

[16] The Pennsylvania Supreme Court applied *Commonwealth v. Pierce*, 527 A.2d 973 (Pa. 1987) when it reviewed Saranchak's claims.  It stated that a petitioner "must 'first demonstrate that the underlying claim is of arguable merit; then, that counsel's action or inaction was not grounded on any reasonable basis designed to effectuate Appellant's interest; and, finally, that but for the act or omission in question, the outcome of the proceedings would have been different.'" *Saranchak-5*, 866 A.2d at 299 (citing *Commonwealth v. Travaglia*, 661 A.2d 352, 356-57 (Pa. 1995)).  Applying this standard, the state court rejected Saranchak's claim on the basis that he could not establish prejudice.  Citing its decision in *Commonwealth v. Stevens*, 739 A.2d 507 (Pa. 1999), the court concluded that "even if counsel would have presented the psychiatrist's revised testimony to the court at the degree of guilt hearing, the court, nevertheless, would have returned a verdict of first degree murder." *Saranchak-5*, 866 A.2d at 300.  Noting the PCRA court's recitation of the "complex series of actions . . . as well as statements," *id.* at 301, of Saranchak on the night of the killings, the supreme court agreed with the PCRA court's conclusion that "there was an overwhelming amount evidence that demonstrated conclusively [Saranchak's] ability to formulate the specific intent to kill." *Id*. Because of this evidence of Saranchak's specific intent to kill, the supreme court concluded that "even if [Saranchak] would have developed psychiatric testimony concerning diminished capacity, the defense would have failed." *Id.*

without analyzing *Strickland*'s deficient performance prong.  However, the PCRA court addressed both the deficient performance and prejudice prongs of *Strickland*. (Doc. 28 at 3-10.)  Consequently, this court will apply § 2254(d) to the state appellate courts' assessment of both prongs of *Strickland*.  Upon this review, the court concludes that the state court's opinion as to this claim was an unreasonable application of clearly established federal law.

### 1.   Factual Background

As set forth above, following Saranchak's arrest Attorney Watkins was appointed to represent him.  Prior to any guilt phase proceedings, Saranchak informed Attorney Watkins that he was choosing to plead guilty to both homicides.  (Notes of Testimony, PCRA Hearing, 2/11, 19/2003 ("PCRA NT") 71-72.)[17]  Saranchak dissuaded Attorney Watkins from a trial, but he did want to contest the degree of homicide based on the inclusion of a burglary charge. (PCRA NT 72.)[18]

In December 1993, prior to the degree of guilt hearing, Attorney Watkins filed a motion for the appointment of a psychiatrist for purposes of conducting a psychiatric evaluation.  Attorney Watkins wanted a psychiatrist to evaluate possible psychiatric issues such as paranoia or schizophrenia; competency issues, such as whether Saranchak was competent to stand trial and capable of participating in his defense; and issues relating to a potential diminished capacity

---

[17] Attorney Watkins' time sheets indicate that Saranchak informed him of his desire to plead guilty on August 26, 1994.  (PCRA, Exhibit No. 9, Bill for Services ("PCRA Ex.") 6.)

[18] Attorney Watkins testified that "[t]he part that bothered [Saranchak] was the burglary part because he didn't kill them for the money, and he didn't steal anything.  And that was his contention; and he was upset about that accusation, but the others he readily admitted to." (PCRA NT 72.)  Based on the evidence presented at the sentencing hearing, however, the jury unanimously found the aggravating circumstance of robbery.  (Notes of Testimony, Sentencing Hearing, 9/15-16/1994 ("Sentencing NT") 182.)

defense.  (PCRA NT 74.)  On May 4, 1994, the trial court granted in part the motion and appointed Dr. Stefan P. Kruszewski, a psychiatrist with a specialization in drug and alcohol addiction, to conduct the psychiatric evaluation and to render his opinion only on the following issues: (1) whether Saranchak was capable of participating with his attorney in preparation of his defense, (2) whether Saranchak was otherwise competent to stand trial, and (3) whether Saranchak's confession to the police was voluntary or involuntary as the result of any psychiatric dysfunction.  (Doc. 9, Appendix of Exhibits to Petition for a Writ of Habeas Corpus, Ex. ("Pet. Ex.") 10 .)  Attorney Watkins testified at the PCRA hearing that he was satisfied with the trial court's order on the limited psychiatric evaluation because "it got me in the door" for seeking further evaluation on Saranchak's diminished capacity and any mitigating factors for death penalty purposes.  (PCRA NT 75.)[19]

Dr. Kruszewski's resulting evaluation was limited to the three areas set forth by the trial court.  (Pet. Ex. 1.)  In conducting the evaluation, Dr. Kruszewski reviewed the initial criminal homicide report, Saranchak's statement to the State Police on the day after the killings, the criminal complaint against Saranchak filed by the State Police, and the statement of Trooper Lipsett of the State Police.[20]  (*Id.* at  2-3.)  Dr. Kruszewski was not provided with any of Saranchak's medical or school records at that time.

---

[19] At the time of Saranchak's degree of guilt hearing and sentencing, Attorney Watkins had approximately fifteen years of experience in criminal matters, and had participated in one capital case through the death penalty phase.  (PCRA NT 104-06.)

[20] Trooper Lipsett was one of the officers who questioned Saranchak upon his arrest. Saranchak admitted to him that he shot his uncle, but denied shooting his grandmother.  (Degree of Guilt Hearing, 9/6/1994 ("Guilt NT") 46-47.)

Dr. Kruszewski interviewed Saranchak on July 13, 1994, prior to the degree of guilt hearing. Saranchak related to Dr. Kruszewski his past history with the legal system, including his criminal record, and drug and alcohol abuse. (*Id*. at 4-5, 8.) Saranchak also informed the doctor that he had been hospitalized for psychiatric reasons, including an incident where he purportedly attempted suicide, was declared dead, but subsequently was revived. (*Id*. at 6, 8.) After reviewing the police reports and statements and interviewing Saranchak, Dr. Kruszewski concluded that Saranchak was competent to participate in his defense and to stand trial. Based on Saranchak's responses to Dr. Kruszewski's questions about his statement to the police, Dr. Kruszewski concluded that he was not suffering from any psychiatric dysfunction at the time he made his voluntary statement to police. (*Id*. at 10-11.)[21]

Attorney Watkins did not return to Dr. Kruszewski to request further evaluation on issues of diminished capacity or issues of mitigation for purposes of sentencing. (*Id*.) Additionally, Attorney Watkins stated that he did not seek to hire any other expert to evaluate Saranchak because Dr. Kruszewski had provided "such a glowing opinion of Mr. Saranchak" when he met with him at Dr.

---

[21] Dr. Kruszewski specifically stated:

> It is very difficult to look back in a retrospective review in order to give an opinion whether a confession, 8 months ago, was given on a voluntary or involuntary basis. However, with this understanding, Mr. Saranchak stated clearly and accurately that, aside from his alleged alcohol intoxication on the previous night, he was not suffering from any psychiatric dysfunction at the time that he gave his statement to the police. Reviewing the information provided to me, despite some comments by Mr. Saranchak to the contrary, it appears that his statement was given without duress, both freely and voluntarily and with the understanding that he was providing it to law enforcement officials.

(Pet. Ex. 1 at 10-11.) Notably, Dr. Kruszewski made this conclusion based on statements made by Saranchak himself.

Kruszewski's office. (PCRA NT 76.)  This testimony is profoundly perplexing,
however, because Attorney Watkins' time sheets indicate that he discussed the
case with Dr. Kruszewski on three occasions, September 8, 13, and 16, 1994, *after*
the degree of guilt phase had been completed. (PCRA Ex. 9.)[22]  Prior to that, no
other psychiatrist was retained to assist the defense in developing expert mental
health evidence for a diminished capacity defense.

The non-jury guilt phase of Saranchak's trial commenced on September 6,
1994.  The following testimony was taken regarding Saranchak's drinking on the
day and evening of the killings. Julian Spirko, a neighbor of Saranchak, testified
as to Saranchak's actions on the day of the killings.  At approximately 3:00 p.m.,
Saranchak and Spirko dumped garbage on a nearby mountain for the owner of
Courtney's Bar.  (Guilt NT 137.)  On the way back, the two men stopped at
Saranchak's grandmother's home, where Saranchak consumed two or three bottles
of beer.  After they returned to their apartments around 5:00 p.m., Spirko later saw
Saranchak at Courtney's Bar at approximately 9:00 p.m., at which time Saranchak
was "in a daze . . . [l]ike he had too much to drink or something."  (*Id*. at 140.)

James Steiner, another neighbor of Saranchak, testified that he spent time
with Saranchak on the evening of the killings.  At approximately 7:00 p.m., after
Saranchak had parted with Spirko, Saranchak and Steiner met to collect discarded
furniture from a nearby apartment and haul it to a dumping area.  (*Id*. at 128-29.)
After unloading the furniture, the two men went to a nearby barroom and drank
three to four drinks each.  (*Id*. at 130-31.)  When they left the bar, Saranchak drove
them to a cemetery where he stopped and spoke to his father's headstone for about

---

[22] Dr. Kruszewski testified at the sentencing phase of Saranchak's trial.  (Sentencing NT
117-129.)  However, at the time of that testimony, Dr. Kruszewski had only evaluated Saranchak
one time, on July 13, 1994, and only on the points set forth in the May 4, 1994 court order. (*See*
Pet. Ex. 1.)

five to ten minutes. (*Id*. at 131.)  From there, the two traveled to a friend's house, where Saranchak consumed another drink, and then went to Courtney's Bar. (*Id*. at 132.)  By the time they arrived at Courtney's Bar at approximately 9:00 p.m., Steiner observed that Saranchak was noticeably intoxicated. (*Id*. at 132.)  Saranchak was "more aggressive than when he wasn't drinking," and was "[g]iggling and talking strange stuff." (*Id*. at 132.)

Saranchak's co-defendant, Roy W. Miles, Jr., testified against Saranchak in exchange for pleading to third degree murder and related charges for his involvement in the crimes.  Miles had met Saranchak in a hospital while Saranchak was a psychiatric in-patient. (*Id*. at 61.)  Miles stated that he and Saranchak had been drinking at Courtney's Bar in Pottsville, Pennsylvania, since 7:30 p.m. that evening.[23] (*Id*. at 70.)  When the two men left the bar at approximately 11:30 p.m., they stopped at a store to purchase beer. (*Id*. at 70-71.)  Saranchak then drove them to his stepfather's house where he obtained a rifle.  The two proceeded to his grandmother's house, where he shot and killed his uncle and his grandmother.[24] (*Id*. at 73-79.)  After leaving Saranchak's grandmother's

---

[23] On direct examination, Miles stated that while the two men were drinking at Courtney's Bar that night, they had a conversation: "As we were playing pool, drinking, having a good time, I guess and he's talking to me, asking me if he knows where we can get some money and I said, not really.  He says, well, I know where we can get some but we might have to shoot someone." (Guilt NT 63.) However, in an affidavit dated December 17, 1997, Miles stated that on that night Saranchak talked to him about going to Virginia, not about killing anyone.  (Affidavit of Roy Miles, Saranchak Background Packet No. 12 ("Miles Affidavit") ¶ 8.)  In addition, he stated, "When I testified I was told by the district attorney that I had to say Danny had said that we might have to shoot someone, even though this isn't true.  My understanding of my conversations with the D.A. was that if I testified favorably I would receive a light sentence . . . the D.A. also told me that if I didn't say what he wanted I would get either a life sentence or a death sentence." (*Id*.)  Miles provided similar testimony at the PCRA hearing in 2003.  (*See* PCRA NT 213-14.)

[24] On direct examination, Miles indicated that he and Saranchak went to Saranchak's stepfather's house for the rifle before going to the store to purchase beer.  (Guilt NT 64.) Attorney Watkins did not question Miles on this discrepancy on cross-examination once Miles

house, Saranchak and Miles returned to Courtney's Bar at approximately 1:00 a.m., stayed there until it closed, and then went to the owner's apartment above the bar, at all times continuing to consume alcohol.  At approximately 4:00 a.m., the two men drove to a diner nearby, where they separated.  Miles took valium later that morning given to him by Saranchak the night before.  (*Id*. at 84.)  He testified that Saranchak had said at the time, "[L]et's eat these," but Miles did not observe Saranchak consume the pills.  (*Id*. at 84.)

Carol Frantz, Saranchak's girlfriend at the time, testified that she saw Saranchak around midnight on the night of the killings when he stopped by his stepfather's home to obtain a gun.  (*Id*. at 111.)  Saranchak was drunk and told her he was going spotting for deer.  (*Id*.)  She also testified that Saranchak thought he was a sergeant in the army when he was under the influence of alcohol, and would speak as if he were so employed.  (*Id*. at 114.)

Several police officers who participated in the investigation also testified. Trooper Reynold Wagner stated that when police picked up Saranchak on the night after the killings, his eyes were glassy and there was an odor of alcoholic beverage on his breath.  (*Id*. at 36.)  Troopers Joseph Lipsett and Kirk Kirkland testified that Saranchak went into a militaristic mental state when responding to questions about his grandmother's shooting, stating that he had been on a "mission" and that the "information was classified."  (*Id*. at 47, 56, 57.)

From the testimony it appears that Saranchak's principal defense was that he lacked the requisite *mens rea* necessary to support a conviction of first-degree murder due to his drinking at the time of the killings.  In fact, during closing arguments Attorney Watkins made the following statement:

---

testified to the opposite.

> Now, the issue that I would raise at this point also deals with the degree of guilt is Mr. Saranchak's state of mind.  Now, there has been a psychological report which was made part of the record[25] but the question remains of Mr. Saranchak's state of mind on that particular night and whether he was under the influence of alcohol or drugs as such as to render his state of mind and capacity diminished.  The issue deals with the specific intent but the specific . . . . [i]n this case the specific intent to kill.  An impulsive and impetuous act is not specific intent nor one with diminished capacity.

(Guilt NT 147.)  After summarizing the testimony set forth above pertaining to Saranchak's drinking, Attorney Watkins stated, "Mr. Saranchak at this point is not in a position to form a specific intent considering what he's been drinking and how he's been acting and the manner in which this act transpired."  (*Id*. at 150-51.) Additionally, at the PCRA hearing, Attorney Watkins testified that he presented the above-referenced witnesses in order "to show [Saranchak's] diminished capacity."  (PCRA NT 111-12.)  However, the record reflects that the witnesses provided little testimony on Saranchak's background relating to alcohol and drug use - they simply testified as to their encounters with Saranchak on the day and evening prior to the killings.  Instead of presenting expert mental health evidence on Saranchak's history of alcoholism, as required by Pennsylvania law when presenting a diminished capacity defense, Attorney Watkins merely relied on these lay witnesses to prove diminished capacity.  *See Commonwealth v. Cuevas*, 832 A.2d 388, 393 (Pa. 2003).

## 2.    Deficient Performance

### a.    Standard of Review

In order to establish that Attorney Watkins' performance was deficient, Saranchak must demonstrate that Attorney Watkins' representation "fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  Recognizing

---

[25] The report Attorney Watkins is referring to here is the report of Dr. Kruszewski, who evaluated Saranchak only on the points set forth in the May 4, 1994 court order pertaining to competency to stand trial.  *See supra* pp. 23-24.

that the scope and intensity of defense counsel's investigation and development of defenses differs with the facts of each case, *Strickland* "did not offer any special standards concerning the duty to investigate[.]" *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 370 (3d Cir. 2002) (citing *Strickland*, 466 U.S. at 691).  The Supreme Court did, however, elaborate as follows:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

Saranchak raised this claim of Attorney Watkins' failure to investigate a diminished capacity defense during his PCRA proceedings.  In its review of this particular claim, the PCRA court adjudicated *Strickland*'s deficient performance prong on the merits.  (*See* Doc. 28 at 3-11.)  As a result, this court will review the deficient performance prong in order to determine if the state court's decision was an unreasonable application of clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).

## b.  **Analysis**

Saranchak argues that police statements detailing Saranchak's bizarre, militaristic behavior, and accounts of Saranchak's drinking on the date of the killings should have prompted Attorney Watkins to further investigate Saranchak's mental health and history of alcoholism in support a diminished capacity defense.  As set forth above, Saranchak contends that trial counsel failed to investigate or obtain certain other evidence related to his mental health and history of chronic alcoholism which would have supported a diminished capacity

defense.  Attorney Watkins' ineffective representation, therefore, lies with his failure to provide Dr. Kruszewski with this information, and more so for his failure to present Dr. Kruszewski's testimony after evaluating such evidence.  That evidence, as identified by Saranchak, includes: (1) expert testimony detailing Saranchak's mental health problems and chronic alcohol abuse; (2) complete school and mental health records detailing Saranchak's history of mental health problems; and (3) information from Saranchak's probation officer, teachers, stepfather, and two half-brothers detailing Saranchak's socially and emotionally disturbed childhood, medical history, and personality disorder due to alcohol abuse.  To evaluate Saranchak's claims here, the court will discuss the evidence in turn.

## (i) <u>Expert testimony</u>

In preparation for Saranchak's PCRA appeal, Harry D. Krop, Ph.D., a licensed clinical psychologist with a private practice in forensic psychology, conducted a forensic psychological evaluation of Saranchak.  (*See* Krop Aff., PCRA Petitioner's Exhibit 2 ("Krop Aff.").)  Based on his two interviews of Saranchak on January 14, 1997, and December 16, 1997, and his review of background materials on Saranchak's case,[26]  Dr. Krop made the following findings.  Saranchak suffers from a serious psychological impairment, explained as follows: "he is a chronically emotionally disturbed individual whose judgment was even more impaired resultant to his extensive use of alcohol (and drugs) on the day and night of the offense."  (Krop Aff. ¶ 14(a).)  Saranchak also suffers from chronic psychiatric/psychological disturbance with the diagnoses of adult

---

[26] Dr. Krop reviewed a background packet which included police reports, sentencing hearings, transcripts, several psychological evaluations including hospitalization records, Dr. Kruszewski's report from July 1994, school records, affidavits from family members, co-defendant Miles, teachers, and Saranchak's probation officer.  (PCRA NT 7-8.)

attention deficit disorder, substance abuse - chronic, personality disorder - "Not Otherwise Specified" ("NOS"), with paranoid and anti-social features (PCRA NT 14), and depressive disorder - NOS.  (Krop Aff. ¶ 14(b).)  Additionally, Saranchak had previously been diagnosed with bipolar affective disorder, depressed type with suicide attempt, episodic dyscontrol syndrome, and delusional thinking disorder. (*Id.*)  As a result of his intoxication, post-trauma symptomatology, delusional beliefs, and underlying mental illness, Saranchak's judgment was significantly impaired.  (*Id*. ¶ 13.)  In Dr. Krop's opinion, at the time of the offenses, Saranchak's capacity to conform his conduct to the requirements of the law was substantially impaired.  (*Id*.)  Dr. Krop, however, made no conclusion that Saranchak's impairments also substantially diminished his capacity to formulate the specific intent to kill.  (*See* PCRA NT 46.)

Additionally, in preparation for his PCRA appeal, Saranchak's PCRA counsel provided Dr. Kruszewski with background material on Saranchak that Attorney Watkins neglected to provide prior to Dr. Kruszewski's initial evaluation of Saranchak pursuant to the May 4, 1994 court order.  After reviewing the additional information, Dr. Kruszewski testified at the PCRA hearing.  (*See id*. at 161-207.)  At the hearing, Dr. Kruszewski initially stated:

> [T]he first thing that struck me is over and over again is the extent of Mr. Saranchak's alcohol history and the behavioral problems as a result of that alcohol history.  I really looked upon it as - - there's an old phrase for people who study alcohol and substances of abuse as a Jekyll and Hyde type syndrome.  And it's the best way for me to explain it to lay persons is that when Mr. Saranchak is not drinking, he has one personality, which is, according to his family and his friends, he's quite a nice guy.  When he's drinking on the other hand, he has specific delusions that are presumably a result of the alcohol and behaves in a very different manner.

(*Id*. at 175.)[27]  He also reported that Saranchak had "severe psychiatric manifestations when drinking." (*Id*. at 180.)  He concluded that Saranchak was suffering from the psychotic effects of alcohol at the time of the killings. (*Id*. at 181.)  In particular, Saranchak had a "psychoactive substance-induced, in this case, alcohol-induced delusional disorder and alcohol-induced depressive disorder when drinking." (*Id*.)  As a result, Dr. Kruszewski opined that, at the time of the killings, Saranchak's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was substantially impaired. (*Id*. at 182.)  Dr. Kruszewski further concluded that:

> Mr. Saranchak's background and history are not consistent with the commission of an intentional killing of family members in cold blood and with premeditation.  It is my opinion that, at the time of the killings, and as a result of his psychiatric impairment coupled with his intoxication, Mr. Saranchak did not have the capacity to form the specific intent to kill.  *Had I been provided the background materials and been asked to testify about diminished capacity, I would have testified to this finding*.

(Kruszewski Aff., PCRA Petitioner's Exhibit 17 ("Kruszewski Aff.") ¶ 10) (emphasis added).

---

[27] During his testimony, Dr. Krop corroborated this point:

There are individuals who can be in a decent mood; and then when they drink, the research clearly shows that they become, you know, I think we heard the terms happy drunk and mean drunks.  The mean drunks don't necessarily start off being unhappy.  But certainly alcohol may affect them that way so that they become more irritable and hostile and potentially violent.

* * *

I think the records [of Saranchak] show from the affidavits, and that's why they referred to him sometimes as a Jekyll and Hyde type of personality in saying that he could be - - a lot of the descriptions of him by family members and friends say that he was fun to be around and a nice guy; but then when he got drunk or was drinking heavily, his mood changed.  He could become moody, depressed, more irritable, and sometimes hostile and sometimes violent.

(PCRA NT 50-51.)

As noted above, Attorney Watkins stated in his PCRA testimony that it was his intention to present a diminished capacity defense to the killings.  Beyond recommending the appointment of Dr. Kruszewski for purposes of evaluating Saranchak's competency to stand trial, however, Attorney Watkins took no further steps to discover evidence of Saranchak's diagnosed mental illness or chronic alcohol abuse.  As a result, trial counsel was unable to support Saranchak's diminished capacity defense with psychiatric evidence establishing that he suffered from any mental disorders which prevented him from forming the specific intent to kill.  The only evidence of diminished capacity presented at the degree of guilt hearing was lay witness testimony that loosely described Saranchak's drinking on the day and night of the killings.

### (ii) <u>School and mental health records</u>

In preparation for Saranchak's PCRA appeal, his PCRA counsel obtained numerous school and hospital records detailing Saranchak's mental health throughout his childhood and up to the time of the killings.  In May of 1980, the Pottsville Area School District diagnosed Saranchak with atypical pervasive developmental disorder.  (School Records, PCRA Petitioner Exhibit 3 ("School Records ") at 4.)  On October 20, 1989, Saranchak was admitted to the Pottsville Hospital for a suicide attempt.  (Hospital Records, PCRA Petitioner Exhibit 4 ("Hospital Records") at 5.)  He was diagnosed at the same hospital with alcohol abuse, continuous, on October 26, 1989.  (*Id*. at 10.)  On December 12, 1990, Saranchak was admitted to First Hospital Wyoming Valley and diagnosed with depressive disorder, NOS, and alcohol abuse. (*Id*. at 33.)  These records were provided to Drs. Kruszewski and Krop for use in their evaluations of Saranchak in preparation for the PCRA hearing.

At the PCRA hearing, Attorney Watkins testified that he knew that Saranchak had been in special education classes, but did not obtain the school records in preparation for the degree of guilt hearing.  (PCRA NT 88-89.)  In addition, Attorney Watkins did not think he had ever obtained hospital records detailing Saranchak's suicide attempts and hospitalizations.  (*Id*. at 88.)  It follows, then, that Attorney Watkins did not provide any of these records to Dr. Kruszewski prior to his evaluation.

Saranchak contends before this court that had Attorney Watkins investigated further and obtained these records and provided them to a medical expert, that evidence could have been used in support of a diminished capacity defense at the degree of guilt hearing.

### (iii) <u>Additional witness testimony</u>

In further preparation for Saranchak's PCRA appeal, PCRA counsel interviewed a number of additional family members and others with knowledge of Saranchak's mental health history.  Saranchak's stepfather and two half-brothers provided affidavits and testified at the PCRA hearing as to Saranchak's problems with alcohol abuse since his early teenage years.  (PCRA NT 130, 146-47, 156-58.)  None of these men was contacted by Attorney Watkins prior to the degree of guilt hearing, though each indicated that he would have provided information had he been asked.  (*Id*. at 135, 151, 158.)

In addition, Saranchak's PCRA counsel supplied affidavits from two of Saranchak's special education teachers and his probation officer.  The first of Saranchak's teachers, John Sutter, reported that, in 1980, Saranchak entered a program for socially and emotionally disturbed children.  (John Sutter Aff., Petitioner Exhibit 7 ("Sutter Aff.") at 1.)  Saranchak's other teacher, David Reichert, reported that when Saranchak was his student in 1983 and 1984, he was

mentally and emotionally disturbed, displaying a great deal of dysfunctional behavior.  (David Reichert Aff., PCRA Petitioner Exhibit 6 ("Reichert Aff.") at 1.) Joseph Szeliga, Saranchak's probation officer for two years until Saranchak's arrest for the underlying offenses, declared that Saranchak has a history of serious psychological problems, a history of alcoholism, and that he had tried to commit suicide in the past.  (Joseph Szeliga Aff., Petitioner Exhibit 8 ("Szeliga Aff.") at 1.)  None of these men was contacted by Attorney Watkins prior to the degree of guilt hearing, though each indicated that he would have provided information had he been asked.  (Sutter Aff. 1; Reichert Aff. 2; Szeliga Aff. 1.)

Saranchak contends before this court that had Attorney Watkins investigated further and discovered this evidence, the evidence would have supported Saranchak's diminished capacity defense as it related to his history of chronic alcohol abuse.  As a result, Saranchak asserts that Attorney Watkins' failure to investigate here constitutes deficient performance under *Strickland*.

### (iv) Legal analysis of (i) - (iii)

As stated above, under *Strickland*'s first prong, Saranchak must demonstrate that counsel's performance was deficient.  The proper standard for attorney performance is that of "reasonably effective assistance," or, in other words, Saranchak must show that trial counsel's performance fell below an objective standard of reasonableness considering all the circumstances.  *Strickland*, 466 U.S. at 687-88.  Counsel's reasonableness must be assessed on the facts of the particular case, viewed as of the time of counsel's conduct.  *Id.* at 689.  In the context of ineffective assistance based on counsel's failure to investigate, the court must determine whether counsel exercised "reasonable professional judgment." *Wiggins*, 539 U.S. at 522-23.  One source for determining the prevailing professional norms is found in the American Bar Association standards for

35

criminal justice.[28]  *See Strickland*, 466 U.S. at 688 (recognizing that the ABA standards are "guides to determining what is reasonable").

In Pennsylvania, when asserting a diminished capacity defense, "a defendant attempts to negate the element of specific intent to kill, and, if successful, first degree murder is reduced to third degree murder." *Commonwealth v. McCullum*, 738 A.2d 1007, 1009 (Pa. 1999). According to the Pennsylvania Supreme Court, diminished capacity is an extremely limited defense under Pennsylvania law. *See Commonwealth v. Taylor*, 876 A.2d 916, 926 (Pa. 2005); *Commonwealth v. Legg*, 711 A.2d 430, 444 (Pa. 1998); *Commonwealth v. Terry*, 521 A.2d 398, 404 (Pa. 1987); *Commonwealth v. Zettlemoyer*, 454 A.2d 937, 943 (Pa. 1982); *Commonwealth v. Weinstein*, 451 A.2d 1344, 1347 (Pa. 1982). "Diminished capacity is an extremely limited defense, which requires extensive psychiatric testimony establishing a defendant suffered from one or more mental disorders which prevented him from formulating the specific intent to kill." *Cuevas*, 832 A.2d at 393 (2003) (holding that episodes of wild behavior and observations by lay witnesses of schizophrenic conduct following a killing have "absolutely no bearing on whether at the time of the killing, a defendant had the mental capacity to form the specific intent to kill") (quoting *Zettlemoyer*, 454 A.2d at 943). A defendant invoking the defense concedes general criminal liability but contends that the prosecution is unable to prove specific intent, an essential element of first-degree murder. *Weinstein*, 451 A.2d at 1347; *see also Zettlemoyer*

---

[28] At the time of Saranchak's degree of guilt hearing, the 1989 ABA Guidelines for capital defense work reflected the prevailing norms in the profession. *See American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 1989, Introduction*, located at http://www.abanet.org/deathpenalty/resources/docs/1989Guidelines.pdf ("1989 ABA Guidelines"). Guideline 11.4.1, Investigation, sets forth a number of sources of investigative information for both the guilt phase and penalty phase, including background information on the accused, potential witnesses, and expert assistance. 1989 ABA Guidelines at 13-16.

*v. Fulcomer*, 923 F.2d 284, 295-96 (3d Cir. 1991). To support the defense, a defendant must proffer admissible evidence that he suffered from a mental illness that affected his cognitive functions to an extent that precluded deliberation and premeditation. *See, e.g., Zettlemoyer*, 454 A.2d at 943; *Commonwealth v. McCullum*, 738 A.2d 1007, 1009 (Pa. 1999).

The diminished capacity defense was first recognized by the Pennsylvania Supreme Court in *Commonwealth v. Walzack*, 360 A.2d 914 (Pa. 1976). In that case, the defendant conceded that he had committed the killing but attempted to offer into evidence testimony from a psychiatric expert to establish that, due to a previous brain surgery (a frontal lobotomy), he did not possess the mental capacity to form the specific intent to kill. The trial court refused to permit the expert to testify, and the defendant was convicted of first-degree murder and sentenced to life imprisonment. On appeal, the Pennsylvania Supreme Court concluded that the defense of diminished capacity was cognizable in Pennsylvania. It also reversed the trial court's decision to exclude the proffered psychiatric evidence, holding that expert evidence that is relevant to a defendant's ability to formulate the specific intent to kill is admissible. *Id.* at 918-19.

Prior to the decision of the Pennsylvania Supreme Court in *Walzack*, state law had precluded the use of expert psychiatric testimony on the issue of a defendant's *mens rea* because of doubt as to the reliability of such testimony. *Terry*, 521 A.2d at 404 (citations omitted); *Walzack*, 360 A.2d at 918. In *Walzack*, however, the Pennsylvania Supreme Court recognized the "tremendous advancements made in the field" of psychiatry and concluded that such testimony could be admissible to support a diminished capacity defense. *Id.*, 360 A.2d at 918-20.

The Pennsylvania Supreme Court subsequently has made clear, however, that *Walzack*

> did not make *all* expert psychiatric testimony on the issues of sanity, malice, specific and general intent admissible or relevant. . . . Such testimony must be definite and specific and address a recognized defense under Pennsylvania substantive law. Nor did [*Walzack* and its progeny] change the rule that expert testimony offered to prove a medico-legal fact, such as causation, is incompetent and inadmissible unless it speaks to more than a mere possibility.

*Terry*, 521 A.2d at 404 (emphasis in original) (citations omitted); *see also Taylor*, 876 A.2d at 926-27; *McCullum*, 738 A.2d at 1009-10.

Accordingly, before a defendant may introduce expert mental health evidence at trial to support a diminished capacity defense, he must establish that the evidence is relevant and probative on the issue of specific intent. *Terry*, 521 A.2d at 404 n.14. Only expert mental health testimony that speaks to "mental disorders affecting cognitive functions necessary to form specific intent" is relevant and admissible. *Id.* (quoting *Weinstein*, 451 A.2d at 1347); *Legg*, 711 A.2d at 439; *Commonwealth v. Davis*, 479 A.2d 1077, 1080 (Pa. Super. 1984) (concluding that personality disorders are irrelevant to show diminished capacity). Moreover, conclusory expert testimony on an ultimate fact, such as the non-existence of specific intent, is improper under Pennsylvania law if the testimony is unsupported by the expert's underlying testimony. *Terry*, 521 A.2d at 403 n.9, 406; *Zettlemoyer*, 454 A.2d at 943-47.

Where the proffered expert mental health evidence does not speak to those mental disorders which affect cognitive functions, the evidence "is irrelevant and hence inadmissible." *Terry,* 521 A.2d at 404 (quoting *Weinstein*, 451 A.2d at 1347). The Pennsylvania Supreme Court has "repeatedly rejected the contention that evidence of a defendant's supposed inability to control his actions – by virtue of an 'irresistible impulse,' a 'compulsion,' or otherwise – is relevant to negate

specific intent, and [the court has] consistently held that such evidence may not be admitted in support of a diminished capacity defense." *Taylor*, 876 A.2d at 926-27 (collecting cases); *Zettlemoyer*, 454 A.2d at 949 ("[N]either social maladjustment, nor lack of self-control, nor impulsiveness, nor psycho-neurosis, nor emotional instability, . . . nor all such conditions combined . . . bear upon the narrow defense of diminished capacity.").

In the present case, the issue is whether trial counsel exercised reasonable professional judgment in failing to investigate further and obtain evidence of Saranchak's mental illness and chronic alcoholism to support the diminished capacity defense. According to Attorney Watkins, he did initially file a motion with the trial court for a psychiatric evaluation. (PCRA NT 73.) However, when the trial court appointed Dr. Kruszewski to perform an evaluation limited to issues relating to Saranchak's competency to stand trial, Attorney Watkins did not subsequently request a further evaluation to address the issue of diminished capacity - a defense he intended to present at the degree of guilt hearing. (*Id*. at 75.) Moreover, Attorney Watkins did not provide Dr. Kruszewski, the only psychiatrist to evaluate Saranchak prior to the degree of guilt hearing, with any background information concerning Saranchak's history. (*Id*. at 165, 170.)[29] According to Dr. Kruszewski, if he had been asked to perform an evaluation for diminished capacity, he would have required counsel provide him with every piece of background information available to him. (*Id*. at 168.) However, Dr. Kruszewski's report following his evaluation of Saranchak and pursuant to the May 1994 court order only stated that Saranchak was competent to stand trial, and, based on information provided to him by Saranchak himself, Saranchak was not

---

[29] In his testimony at the PCRA hearing, Dr. Kruszewski confirmed that his testimony at the sentencing phase was based solely on information provided by Saranchak himself. (PCRA NT 171.)

suffering any psychiatric dysfunction at the time he gave his statement to police. (Psychiatric Evaluation by Dr. Kruszewski, PCRA Petitioner's Exhibit 12 ("Kruszewski Report") at 10-11.) Upon receipt of that report, trial counsel ceased investigation.

Based on this evidence, the court concludes that at the time counsel decided not to investigate further, he knew or should have known, from Saranchak's behavior, documented in police statements, and Dr. Kruszewski's initial report containing Saranchak's personal account of hospitalization for psychiatric problems such as suicide attempts, that "there might be some mental health issues that would need exploring in this case." (PCRA NT 69.) In support, Attorney Watkins knew that during his statement to police Saranchak went into a bizarre, militaristic mental state. He also had information on the extent of Saranchak's drinking on the day and night of the killings, as well as his history of severe alcoholism. (*Id*. at 91.) Counsel interviewed Saranchak's mother and girlfriend before trial, but did not recall asking them any questions regarding Saranchak's mental health history, childhood, or background. (PCRA NT 86-88.) Counsel did not interview any other members of Saranchak's family, including his stepfather or two stepbrothers. (*Id*.) Nor did he interview Saranchak's probation officer, despite knowing that Saranchak had a criminal history, or teachers, who had extensive information about Saranchak. (*Id*. at 91-92.) Counsel also did not obtain any of Saranchak's school, medical or hospital records prior to the degree of guilt hearing, despite being put on notice through Dr. Kruszewski's report that Saranchak had such records. (*Id*. at 88-89.)

Attorney Watkins' testimony at the PCRA hearing does not indicate that he had any strategic reason for not obtaining this history of Saranchak for purposes of

presenting a diminished capacity defense.[30]  Watkins himself stated that it was his intention to present a diminished capacity defense and apparently he believed that he had.  The evidence he presented, however, failed to establish the defense as a matter of law.  Lay testimony alone is inadequate when presenting a diminished capacity defense.  Pursuant to Pennsylvania state law, expert testimony on how one's mental disorder affected the cognitive functions necessary to form the specific intent is the only relevant testimony required in order to demonstrate that defense.  *See Zettlemoyer*, 923 F.2d at 295.

In light of all that was known or made available to counsel, the court concludes that Saranchak has satisfied the first prong of the *Strickland* test.  Saranchak has shown that trial counsel did not exercise reasonable professional judgment in failing to investigate further and discover evidence of Saranchak's mental impairments as a result of chronic alcohol abuse which could have prevented him from forming the specific intent to kill his grandmother and uncle.  Counsel's disregard for conspicuous pieces of evidence that pointed to a potentially successful defense cannot be described as anything short of deficient representation.  Moreover, the PCRA court found that Dr. Kruszewski's testimony was sufficient to satisfy the deficient performance prong of *Strickland*.  The PCRA court commented as follows: "Although we were not impressed with Dr. Kruszewski's testimony, and quite frankly, found it to be incredible in light of the facts and circumstances surrounding [Saranchak's] action, we believe that an

---

[30] At the PCRA hearing, Attorney Watkins testified that, following Dr. Kruszewski's initial evaluation of Saranchak pursuant to the court order, he did not return to Dr. Kruszewski or any other expert for further evaluation of Saranchak specifically to address issues of diminished capacity because Dr. Kruszewski "gave such a glowing opinion of Mr. Saranchak," when Attorney Watkins met with the doctor in his office.  However, Attorney Watkins timesheets indicate that he met with Dr. Kruszewski at his office on September 13, 1994, one week *after* the degree of guilt phase.  (*See* PCRA NT 76; Bill for Services, PCRA Petitioner's Exhibit 9, at 7.)

appellate court would conclude that his testimony is sufficient to satisfy the first prong to [Saranchak's] ineffectiveness claim." (Doc. 28 at 7.)  This finding of deficient performance by the PCRA court is not an unreasonable application of the deficient performance prong of *Strickland*.  *See* 28 U.S.C. § 2254(d)(1).

### 3.   Prejudice

### a.   Standard of Review

In addition to establishing that his attorney performed deficiently, Saranchak must demonstrate that he was prejudiced by counsel's error.  *See Strickland*, 466 U.S. at 692.  The prejudice prong requires Saranchak to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  Saranchak need not show that counsel's deficient performance "more likely than not altered the outcome in the case;" rather, he must show only "a probability sufficient to undermine confidence in the outcome."  *Id.* at 693-94.  "A 'reasonable probability' is less than a preponderance: '[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.'"  *Id*. at 694.  This standard is not "'a stringent one.'"  *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001) (quoting *Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999)).  The court must assess prejudice according to the "totality of the evidence."  *Strickland*, 466 U.S. at 695.

In an ineffectiveness claim involving a diminished capacity defense, the Third Circuit emphasized in *Jacobs* that "[Petitioner] need not establish his diminished capacity defense conclusively for the purpose of demonstrating a Sixth Amendment violation.  Rather, as we have explained, he is required to show only a reasonable probability that the outcome of the proceedings would have been

different if trial counsel had presented evidence of [Petitioner's mental health impairments]. *See Strickland*, 466 U.S. at 694." 395 at 105 n.8.

In this case, the Pennsylvania Supreme Court adjudicated Saranchak's *Strickland*'s prejudice claim on the merits. *Saranchak-5*, 866 A.2d at 299-301. Accordingly, this court must apply § 2254(d)'s standard of review to that portion of the analysis.

### b.   **Analysis**

From a review of the record in this case, the court is persuaded that Saranchak has satisfied the prejudice prong of *Strickland* because if Attorney Watkins had performed an objectively reasonable investigation, Dr. Kruszewski would have testified to establish the defense of diminished capacity. As detailed above, Dr. Kruszewski was the only psychiatrist to evaluate Saranchak prior to the degree of guilt hearing. His evaluation was limited by court order to competency issues. At the time of that evaluation, Attorney Watkins failed to provide Dr. Kruszewski with any background material on Saranchak. However, Dr. Kruszewski was notably the only medical expert to evaluate Saranchak at a time relatively proximate to the killings. Dr. Kruszewski, when supplied with the relevant medical and psychiatric history, concluded that Saranchak's psychiatric impairments coupled with his intoxication deprived him of the capacity to form a specific intent to kill. (Kruszewski Aff. ¶ 10.) Saranchak's "capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired." (*Id*. ¶ 9.) Dr. Kruszewski would have testified to these conclusions at the degree of guilt and sentencing

hearings had he been asked by defense counsel to evaluate Saranchak on such issues. (*Id*. ¶¶ 9, 10.)[31]

Dr. Krop also evaluated Saranchak and concluded that "[a]s a result of his intoxication, post-traumatic symptomatology, delusional beliefs, and underlying mental illness, Mr. Saranchak's judgment was significantly impaired." (Krop Aff. ¶ 13.)  "[Saranchak] lacked the capacity to reason and function in a rational way. As a result, at the time of the offense, he suffered from a substantially impaired capacity to conform his conduct to the requirements of the law . . . ." (*Id*.) However, in his testimony at the 2003 PCRA hearing Dr. Krop was unwilling to opine as to Saranchak's specific intent to kill at the time of the killings. (PCRA NT 46.)

To reiterate, in Pennsylvania, diminished capacity "is an extremely limited defense, which requires extensive psychiatric testimony establishing a defendant suffered from one or more mental disorders which prevented him from formulating the specific intent to kill." *Cuevas*, 832 A.2d at 393.  While Dr. Kruszewski expressed a willingness to testify that Saranchak suffered from psychiatric impairments coupled with intoxication that deprived him of the capacity to form the specific intent to kill, Dr. Krop was not willing to make the same assessment of Saranchak's specific intent.  Dr. Krop, however, evaluated Saranchak in 1997, over three years after the killings.  Dr. Kruszewski's initial interview with Saranchak occurred in 1994. Although his first evaluation was for the limited purpose of competency, his subsequent conclusions on Saranchak's incapacity to

---

[31] Dr. Kruszewski stated that defense counsel neither asked him to conduct an evaluation of Saranchak for mitigating evidence or diminished capacity nor provided him with any background material on Saranchak prior to the degree of guilt hearing or to sentencing. (Kruszewski Aff. ¶¶ 3, 4.)  He also stated that he did not have any discussions with Attorney Watkins prior to receiving a subpoena to testify at Saranchak's sentencing hearing.  (*Id*. ¶ 7.)

form the specific intent to kill arose from his interview with Saranchak at a time proximate to the killings, as well as his evaluation of Saranchak's background material.

The court is persuaded that if the trial court had heard testimony from Dr. Kruszewski on his evaluation of Saranchak's mental capacity following his extensive review of Saranchak's medical and social history, there is a reasonable probability that the trial court, following the law, would have found Saranchak guilty of third degree murder, not first degree murder. While the significance of the trial court sitting as PCRA court is not lost on this court, the following must be noted. In its opinion and order following Saranchak's *first* PCRA petition, the trial court concluded that because Saranchak performed a complex series of actions on the night of the killings, "*no testimony given by [Saranchak]* could have overcome the conclusion that his capacity to formulate specific intent was diminished." (Doc. 27-2 at 3) (emphasis added). However, under Pennsylvania law, it is the testimony of a medical expert that is necessary and required to overcome evidence of specific intent, not testimony of the defendant himself. *See Zettlemoyer*, 454 A.2d at 943. It follows, then, that had Attorney Watkins presented a diminished capacity defense with supporting expert testimony, there is a reasonable probability that the trial court would have come to a different conclusion.

Further, in its opinion and order following Saranchak's *second* PCRA petition, the trial court concluded, "the evidence of [Saranchak's] ability to formulate the specific intent to kill is so overwhelming that he did not suffer any prejudice from Attorney Watkins's failure to present *additional* evidence of diminished capacity." (Doc. 28 at 10) (emphasis added). Again, in Pennsylvania, expert testimony is required in order to present a diminished capacity defense. *See*

45

*Zettlemoyer*, 454 A.2d at 943.  Here, no such testimony was presented.  A diminished capacity defense based on lay witness testimony, as was presented in this case, is simply not sufficient to sustain such a defense.  It is the expert testimony that lays the groundwork for diminished capacity - without it there is no supporting evidence for the defense.  Had Attorney Watkins presented such expert testimony, it would have not have been "additional" evidence; rather, it would have been the only essential evidence to establish diminished capacity.  Therefore, had the trial court heard the evidence, as it was presented at the PCRA hearing, it cannot be said that there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

While it is certainly true that "a court must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied," *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999), the state court's application of this clearly established legal principle was not only incorrect, but was also objectively unreasonable.  *See* 28 U.S.C. § 2254(d)(1); *see also Albrecht v. Horn*, 485 F.3d 103, 116 (3d Cir. 2007) ("A federal habeas court may not issue the writ simply because it concludes in its independent judgment that the state court applied clearly established law incorrectly.  *Williams*, 529 U.S. at 410.  'Rather, that application must also be unreasonable.' *Id*.")  Accordingly, the state court's decision to deny Saranchak's claim for relief on the grounds that he was denied effective assistance of counsel here "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

**B.  Further Defense Counsel Error**

In concluding that the performance of Saranchak's counsel satisfied the *Strickland* test, the state court relied on the overwhelming evidence of guilt and specific intent to kill to determine that the Commonwealth had satisfied the prejudice prong. However, the Commonwealth established specific intent to kill with evidence that Saranchak argues should have been suppressed or stricken from the record, but was not suppressed or stricken because of Attorney Watkins' deficient performance. That evidence includes, in part, statements Saranchak made to police and a statement he made to a Child and Youth Services ("CYS") caseworker. Saranchak argues that these key pieces of evidence,[32] which served to establish specific intent to kill, should never have been admitted. In that regard, Saranchak contends that counsel's deficient performance in failing to litigate all these issues prejudiced him to the extent that there is a reasonable probability that the result of the proceedings would have been different. *See Strickland*, 466 U.S. at 694.

The court agrees. Operating with the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id*. at 689, the court nonetheless concludes that these errors made by Saranchak's counsel with regard to the evidence stated above fell outside that "wide range of reasonable professional assistance." Importantly, the court need not decide whether one or another or less than all of these errors would be sufficient, because *Strickland* directs it to look at the "totality of the evidence before the judge or jury," keeping in mind that "[s]ome errors [ ] have . . . a persuasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture . . . ." *Id*. at 695-96. The court therefore will consider the errors in the aggregate.

---

[32] Saranchak also contends that the testimony of his co-defendant, Roy Miles, should have been suppressed or stricken. In light of the court's disposition of the other key pieces of evidence, the court need not address this argument.

*See Marshall v. Hendricks*, 307 F.3d 36, 94 (3d Cir. 2002) (recognizing the approach of evaluating prejudice in light of combined errors); *Lindstat v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (considering counsel's error in the aggregate to determine prejudice); *Berryman v. Morton*, 100 F.3d 1089, 1097-1102 (3d Cir. 1996) (evaluating the reasonableness of trial counsel's strategy with respect to each alleged error, then determining whether the combined errors constituted prejudice).  Further, the resulting prejudicial effect of these cumulative errors has undermined this court's confidence in the outcome of both phases of the proceedings against Saranchak.

The court will evaluate, in turn, the deficient performance, as it relates to each claim, then will examine the prejudicial effect in the aggregate.

### 1. Failure to Litigate Suppression Issue - Statement to Police

Saranchak disputes the admissibility of statements he made to police while in custody and the resulting alleged failure of counsel to effectively litigate suppression of those statements.  Initially, he contends that his statements to police violated his Fifth Amendment *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), in that police continued to interrogate him despite his invocation of his right to remain silent.  He asserts that his counsel was ineffective for failing to litigate this issue.  Saranchak argues that counsel's ineffective assistance in this respect, coupled with a faulty colloquy conducted by the trial court prior to the degree of guilt hearing, prejudiced him.  As relief, he seeks to have his plea vacated and a new trial ordered.

The court will review this claim in order to determine if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law."  § 2254(d)(1).  The Pennsylvania Supreme Court addressed only the prejudice prong of the *Strickland*

test as it relates to the claim, without evaluating the underlying substantive claims of the admissibility of Saranchak's statements to police, the constitutionality of Saranchak's guilty plea, and the alleged defective trial court colloquy with respect to the suppression issues in light of a guilty plea.  However, the PCRA court did adjudicate each subsection of this claim on the merits.  As a result, this court will review the claims under § 2254(d).

### a.   **Background**

Considering the *Miranda* issues first, the court must review the PCRA court's evaluation of the admissibility of Saranchak's statements made to police while in custody.[33]  The admissibility of his statements turns on whether he made a voluntary, knowing and intelligent waiver of his Fifth Amendment right to remain silent and to consult with an attorney prior to speaking with police.  *See Miranda*, 384 U.S. at 444-45 (1966).

The supporting factual background is as follows, as recounted by police officers who testified at both the degree of guilt and sentencing hearings.  On October 16, 1993, Pennsylvania State Police Officers Reynold Wagner and Kirk Kirkland took Saranchak into police custody as a suspect in the killings of his grandmother and uncle the previous night.  Trooper Wagner advised Saranchak of his constitutional rights at 8:41 p.m., while traveling to the station.  (Pet. Ex. 9 at 25.)  Saranchak responded that he understood his rights.  (*Id.*)

Once they reached the police station, a third police officer, Trooper Joseph Lipsett, advised Saranchak of his constitutional rights again at 9:10 p.m.  (*Id.*)  At that point, Saranchak gave an initial statement, which was later reduced to writing,

---

[33] There is no issue as to whether Saranchak was in custody at the time he made the statements.

regarding dumping trash illegally.  (*Id.*; *see also* Guilt NT 30.)  Then, according to

Trooper Wagner, at approximately 11:30 p.m.:

> We had a written statement but initially what Mr. Saranchak thought
> we wanted to question him about was some illegal dumping.  He was
> extremely evasive with us.  Later upon questioning him further, his
> body became very rigid and he went into kind of a militaristic attitude
> about him.  We asked him . . . .  Began to question him further about
> his possible involvement in the murder.  He became very rigid.  Yes,
> sir.  No, sir.  I can't answer that.  That's classified, sir.  I just can't tell
> you that, sir.  Please don't ask me.  It's classified.  Eventually he
> admitted to us that he shot his . . . uncle. . . .  He would never admit
> at that time that he shot his grandmother.  When we asked him about
> the death of his grandmother, he indicated that he was on a mission
> but that information is classified and please, don't ask us any
> further.[34]

(Sentencing NT 38.)  By this time, Saranchak had been advised of his

constitutional rights prior to this exchange on two occasions: in the patrol car

while traveling to the police station, and upon arrival at the station itself.  *Id.* at 39.

Trooper Wagner did not, however, indicate that police officers acknowledged any

of Saranchak's statements to them such as, "Please don't ask me," "I can't answer

that," or "That's classified, sir."  Rather, Trooper Wagner's testimony suggests

that interrogation continued, despite Saranchak's comments and requests, until a

confession was obtained.

After this interview, Saranchak was taken to a separate holding area in the

police station.  While in that area, Saranchak was approached by Trooper

Kirkland.  Trooper Kirkland did not provide a fresh set of *Miranda* warnings prior

to his exchange with Saranchak in the holding area.  He recounted the exchange as

follows:

> I questioned him.  I didn't understand how the shell casing got
> underneath his uncle's body between the uncle and the couch and at
> that time we did a little, what would be called play acting, where I
> was standing and I would be him and I was at the scene and I was

---

[34] Trooper Lipsett gave a similar account at the degree of guilt hearing. *See* Guilt NT 46-
47.

holding a weapon but there was nothing in my hand.  Mr. Saranchak guided me through the shooting of his uncle.

                                    * * *

Mr. Saranchak said, ten seconds into the house my mission was over. I said to him, in other words, you only shot your uncle?  He said, yes, sir.  I said, I don't understand how the shell casing got underneath Edju - - which is the nickname for his uncle. . . .  I said to him, I'm standing inside the door.  Stoker right here and pointing to my right front such as this and at that point, he said, are you in the first or second door?  I said, second door.  Bathroom there - - pointing directly to my left.  Stoker there - - pointing to my right again.  Mr. Saranchak said, no, take two clicks forward.  I took two steps forward.  I said, stoker right here.  Edju there and pointing to my left. He said, no, take two clicks forward.  Taking two steps forward, I said, stoker right here.  Edju there.  He said . . . . He said, no, take two clicks forward.  Two clicks, I said, Edju.  He said to me, turn left, aim weapon and fire.  I did as he described.  Saranchak said, turn left, pull bolt and eject shell casing.  I did as he described ejecting the shell . . . . I said to him, you ejected the shell on to him?  Mr. Saranchak said, yes, sir, present arms.  Doing as he described, I said to him, your mission isn't over yet.  He said, yes, sir, it is.  I said, what about your grandmother?  She is still alive.  Who killed her?  He said to me, that's classified, sir.  You know I can't . . . . You know that.  So, please, don't keep asking me that.  You know I can't tell you that. End of discussion.

(Sentencing NT 49-51.)

### b.    <u>Constitutional Violation</u>

Saranchak contends that his counsel should have litigated suppression of these statements to police because he had invoked his right to remain silent while being questioned.  Specifically, Saranchak argues that his refusal to answer certain questions, his requests that police stop asking him questions, and his refusal to sign the statement about the illegal dumping stating that he gave the statement of his own free will, all indicate that Saranchak had invoked his right to remain silent, but police nevertheless continued to elicit incriminating statements from him.

Although the Pennsylvania Supreme Court did not address the deficient performance prong of the *Strickland* test on the merits, the PCRA court did in its opinion following the PCRA hearing.  Specifically, the PCRA court evaluated

Saranchak's claim that any incriminating responses elicited after he invoked the right to remain silent should have been suppressed.  The court found this claim to have arguable merit "because *any* indication by an individual before or during questioning that he wishes to remain silent requires police to cease the interrogation."  (Doc. 28 at 12-13.)

The PCRA court did not cite to any case law in making this determination.  However, based on precedential federal case law, the court concludes that the PCRA court did identify the correct governing legal rule and applied it reasonably to the facts of this case.  § 2254(d)(1); *see Miranda v. Arizona*, 384 U.S. at 473-74 ("Once warnings have been given, the subsequent procedure is clear.  If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.  If the state violates this rule, the prosecution may not use a suspect's responses to the custodial interrogation in its case-in-chief.") (quotations and citation omitted); *Michigan v. Mosley*, 423 U.S. 96, 102 (1975) (reasoning that allowing interrogation "after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned"); *United States v. Tyler*, 164 F.3d 150, 155 (3d Cir. 2002) (petitioner's statement to police suppressed upon finding that police failed to "scrupulously honor" petitioner's right to remain silent, under *Miranda*); *United States v. Lafferty*, 503 F.3d 293, 304 (3d Cir. 2007) (concluding that "[u]nder *Miranda* the onus [is] not on [the suspect] to be persistent in her demand to remain silent.").  As such, the PCRA Court's determination will not be disturbed.

### c.     **Failure to Litigate Suppression Issues**

Saranchak subsequently argues that by not seeking suppression of these statements, his counsel was so deficient as to undermine the confidence of the

outcome of the proceedings.[35]  *See Strickland*, 466 U.S. at 694.  Further
compounding this deficient performance, Saranchak argues, was the faulty trial
court colloquy addressing the suppression issues.  The court will address these
claims together.

The background is as follows.  On September 1, 1994, Saranchak entered a
general plea of guilty to two counts of criminal homicide.  Prior to entering the
plea, Attorney Watkins filed a motion to suppress certain evidence.  At the plea
proceeding, the trial court conducted a colloquy.  Specifically, the trial court
informed Saranchak,

> [T]here is a request in your omnibus pretrial motion for suppression
> of evidence in that petitioner . . . [has] requested . . . that the
> statements taken from you should be suppressed in that they were
> taken without your consent and any waiver that you may have given
> was ineffective because of your mental state and could not be
> knowing and intelligent.  If you plead guilty to criminal homicide . . .
> then that suppression motion would be deemed given up or waived.
> Do you understand what I'm asking you?  Are you waiving or giving
> up that right to the suppression part of your omnibus motion?

Notes of Testimony, 9/1/1994, ("Plea NT") 7-8.)  Saranchak responded to the trial
court in the affirmative.  (*Id*. at 8.)  Attorney Watkins then informed the trial court
that prior to the proceeding he had discussed with Saranchak "the whole procedure
and whether or not to go to trial, the sentencing procedures . . . ." (*Id*.)  Later, the
trial court again asked Saranchak if he understood that by pleading guilty
generally to criminal homicide "you give up your right to file any pre or post trial
motions and any such motions already filed[.]" (*Id*. at 18.)  Again, Saranchak
responded in the affirmative.  (*Id*.)  As a result, Attorney Watkins withdrew the
suppression motion.

At the PCRA hearing, Attorney Watkins agreed with the Defender
Association that the circumstances surrounding Saranchak's statement to police

---

[35] The court addresses the question of prejudice *infra*.

could "cause[ ] . . . a defense attorney to think that suppression might be a viable issue to explore."  (PCRA NT 79.)  Further:

| | |
|---|---|
| [PCRA Counsel]: | When Mr. Saranchak pled guilty at the plea colloquy proceeding, he was advised by Judge Dolbin that his guilty plea was waiving his right to pursue the suppression motion that you had filed on his behalf, do you recall that? |
| [Attorney Watkins]: | I don't independently recall that, but I know that that's a standard part.  I've heard it so many times.  I couldn't remember that precisely from this case. |
| [PCRA Counsel]: | Okay.  And is that something that you would have discussed with Mr. Saranchak *prior* to the plea proceeding what rights he was giving up by pleading guilty? |
| [Attorney Watkins]: | Yes. |
| [PCRA Counsel]: | And is that your understanding of the law that the guilty plea waives the right to seek suppression? |
| [Attorney Watkins]: | Yes. |
| [PCRA Counsel]: | And is that why you didn't pursue the motion that you had filed? |
| [Attorney Watkins]: | Mr. Saranchak I believe told me not to, that he wanted to plead guilty.  Pretty much the way in this case you were scheduled to do this, I don't know when, a year ago, and he decided not to do it.  He was telling me he did not want to go [to] trial.  He wanted to plead guilty. |
| | * * * |
| | I couldn't tell you if he specifically said withdraw the motion, but he said don't pursue it. |
| [PCRA Counsel]: | Okay.  And it was your belief that once he pled guilty, he couldn't pursue the suppression motion, right? |
| [Attorney Watkins]: | Yes. |

54

(*Id*. at 79-81) (emphasis added).

The PCRA court did make a determination of *Strickland*'s deficient performance prong on the merits. Specifically, the PCRA court credited Attorney Watkins' testimony, finding that, based on the direction he received from Saranchak to forego pursuing the suppression motion, Attorney Watkins had a reasonable basis for failing to pursue the motion. In doing so, the PCRA court stated, "According to Attorney Watkins, it was [Saranchak's] desire to plead guilty to the murders and proceed with the degree of guilt hearing." (Doc. 28 at 13.)

The fundamental flaw in the PCRA court's finding that Attorney Watkins had a reasonable basis for failing to pursue the suppression motion lies with its misapplication of the law. Both the PCRA court and the trial court (same judge presiding over both courts) had an erroneous understanding of Pennsylvania law regarding what rights Saranchak would necessarily waive upon pleading guilty to criminal homicide generally. (PCRA NT 79-80.) Further, Attorney Watkins had the same misunderstanding. In Pennsylvania, "in pleading guilty generally to a murder indictment, a defendant does not thereby waive his right to object to the admission of improper evidence which will bear on the degree of guilt and the punishment to be imposed." *Commonwealth v. Marsh*, 271 A.2d 481, 483-84 (Pa. 1970) (citing *Commonwealth v. Garrett*, 229 A.2d 922 (Pa. 1967)).

PCRA counsel confirmed that Attorney Watkins had discussed his misunderstanding of Saranchak's rights *prior* to Saranchak's general guilty plea. (PCRA NT 80.) When Attorney Watkins then testified that Saranchak told him not to pursue the suppression motion, he made it clear that Saranchak directed him not to do so prior to the guilty plea colloquy proceeding. (*Id*.) He testified, "[Saranchak] was telling me he did not want to go [to] trial. He wanted to plead guilty." (*Id*.) The PCRA Court characterized this testimony as follows:

"According to Attorney Watkins, it was [Saranchak's] desire to plead guilty to the murders and proceed with the degree of guilt hearing." (Doc. 28 at 13.) However, the fact that Saranchak had a desire to plead guilty to criminal homicide generally and to proceed to a degree of guilt hearing does not necessarily lead this court to conclude that, had he been advised properly of Pennsylvania law on suppression of improper evidence at a degree of guilt hearing, Saranchak would have made the same decision. A suppression motion, had Attorney Watkins pursued one, may have benefitted Saranchak at the degree of guilt phase. However, that point is not to be decided here by this court. Simply stated, a desire to plead guilty generally to criminal homicide should not provide one's counsel with a reasonable basis for failing to seek suppression of improper evidence at the degree of guilt phase.

In light of Attorney Watkins' clear misunderstanding of the law regarding a general guilty plea, the court concludes that Attorney Watkins' decision to withdraw the suppression motion based on Saranchak's desire to plead guilty to criminal homicide generally and to proceed to a degree of guilt hearing falls below the objective standard of reasonableness. *See Strickland*, 466 U.S. at 688. As such, Attorney Watkins' performance was deficient. *See Everett v. Beard*, 290 F.3d 500, 509 (3d Cir. 2002) ("Of course, the state of the law is central to an evaluation of counsel's performance at trial. A reasonably competent attorney patently is required to know the state of the applicable law"), *abrogated on other grounds by Early v. Packer*, 537 U.S. 3 (2002); *Woodford v. Visciotti*, 537 U.S. 19 (2002); *Bell v. Cone*, 535 U.S. 685 (2002). Consequently, the PCRA court's determination that Attorney Watkins' performance was not deficient is an unreasonable application of clearly established law. § 2254(d)(1).

### 2.   Failure to Litigate Suppression Issue - Statement Made to Child and Youth Services Caseworker

Saranchak's claims that the incriminating statements he made to Lisa Garber, a Child and Youth Services ("CYS") caseworker, while in police custody, should have been suppressed.  In support, he contends that the CYS caseworker subjected him to a custodial interrogation without providing procedural safeguards, such as advising him of his *Miranda* rights or providing notice to his attorney, to secure his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to legal representation.  Saranchak further argues that his counsel was ineffective because he should have sought to suppress the statements in light of those constitutional violations.  That ineffective assistance, he argues, resulted in a reasonable probability that the outcome of the proceedings would have been different.

The Pennsylvania Supreme Court held that these claims had no merit based on its determination that Ms. Garber was not required to administer *Miranda* warnings prior to questioning Saranchak. Consequently, Saranchak contends that the supreme court's decision is contrary to clearly established federal law, "or, at the very least, an unreasonable application of federal law."  (Doc. 18 at 48.)  *See* 28 U.S.C. § 2254(d)(1).

### a.   Background

Ms. Garber testified at both the degree of guilt and sentencing hearings.  At the degree of guilt hearing, she testified that she visited Saranchak at the prison on April 22, 1994, to discuss custody issues relating to Saranchak's children.  (Guilt NT 90.)  She spoke with him for approximately forty-five (45) minutes.  (*Id*. at 91.)  After discussing Saranchak's children, Ms. Garber asked Saranchak about the killings:

[Ms. Garber]:        I asked him that I couldn't understand nor could the worker previous to me how any of this had happened.

[Commonwealth]:   Any of what?

[Ms. Garber]:        The murders.

\* \* \*

He then went on to tell me about the murders, why he had done it, etc.

[Commonwealth]:   What specifically did he tell you?

[Ms. Garber]:        He admitted to killing his uncle. He told me that he had killed him because of fear of being talked about and greed. . . . He also said that when he did it he had had a few beers but he had said, I wasn't intoxicated. I snapped. The second question I asked him was, then why . . . . During our court hearing the judge had asked him about what he was in prison for and what he was pleading and he had said he was pleading not guilty and I asked him why he had said that at our court hearing. He started to explain to me that he was accused of stealing and that he didn't steal anything. That Roy had stole everything and that he would only serve time for the murders. That he had committed them.

(*Id*. at 91-92.) On cross-examination, Ms. Garber was asked the following:

[Attorney Watkins]:    You were with [Saranchak] for approximately, what, 45 minutes?

[Ms. Garber]:        Mm-hmm.

[Attorney Watkins]:    In the prison, and the initial questions were concerning issues of the three children?

\* \* \*

And this came about just . . . . He brought it up out of thin air or how did it come out?

[Ms. Garber]:        I had said to him that, something along the lines that Laurie Chuba, who was the previous worker, nor anyone else could understand how any of this happened.

58

| | | |
|---|---|---|
| [Attorney Watkins]: | Any of this, meaning the incident out at Five Points? | |
| [Ms. Garber]: | Yes. | |
| [Attorney Watkins]: | That's how it arose? | |
| [Ms. Garber]: | Yes. | |
| [Attorney Watkins]: | It hadn't been mentioned before? | |
| [Ms. Garber]: | He had . . . . He had talked about writing his children letters . . . . He did say that he would put in that he had done something bad and he would be in jail for a very long time. | |

(*Id.* at 95-96.)  Ms. Garber provided very similar testimony at the sentencing phase.  (*See* Sentencing NT 79-86.)  She also stated that the reason she visited Saranchak at the prison was to discuss a schedule for visitation with his children. (*Id.* at 86-87.)

### b.    Constitutional Violations

Saranchak contends that his Fifth and Sixth Amendment rights were violated when Ms. Garber subjected him to questioning without first advising him of his *Miranda* rights or providing notice to his attorney.  The Pennsylvania Supreme Court determined that this claim had no merit, and therefore did not address counsel's ineffective assistance.  In our review of this claim, this is a two-part inquiry based on Saranchak's rights under the Fifth and Sixth Amendments that the court will discuss in turn.

### i.    Fifth Amendment

The court's initial inquiry must be whether the Fifth Amendment privilege is applicable in these circumstances.  While it is uncontested that Saranchak was "in custody" at the time he was questioned by Ms. Garber, at issue is whether Ms. Garber's questioning can be considered "interrogation" for purposes of invoking the Fifth Amendment privilege.

In *Miranda*, the United States Supreme Court acknowledged that "the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Id*., 384 U.S. at 467.  *Miranda* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. at 444.  Therefore, absent other fully effective procedures, an individual in custody must receive certain warnings before any official interrogation, including warnings that he has a "right to remain silent" and that "anything said can and will be used against the individual in court." *Id*. at 467-69; *see also Estelle v. Smith*, 451 U.S. 454, 466-67 (1981).

In *Smith*, the United States Supreme Court concluded that the respondent's Fifth and Sixth Amendment rights were violated when he was questioned by a court psychiatrist for the limited purpose of competency to stand trial, yet his inculpatory answers were used against him at sentencing. *Id*. at 470-71.  At the time of questioning, the respondent was in jail, awaiting trial, and represented by counsel.  However, the psychiatrist failed to apprise him of his *Miranda* rights prior to questioning.

With respect to his Fifth Amendment right to silence, the Court found that the fact that the respondent was questioned by a court-appointed psychiatrist "rather than by a police officer, government informant, or prosecuting attorney, is immaterial." *Id*. at 467.  In support, the Court stated, "When [the psychiatrist] went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future

dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Id*. In this case, Ms. Garber and her resulting testimony performed a similar function. When Ms. Garber went beyond reporting to the Children and Youth court on the status of Saranchak's children, and, in fact, testified for the Commonwealth at both phases of the proceedings on the crucial issues of Saranchak's degree of guilt and any aggravating factors to be considered other than those pursued by the Commonwealth, her role changed and became that of a state agent "recounting unwarned statements made in a postarrest custodial setting." *Id*.

The Fifth Amendment right to remain silent cannot be invoked, however, unless it is established that Saranchak was subject to interrogation. *See Miranda*, 384 U.S. at 444. Under the prophylactic rules announced in *Miranda*, a statement made by a suspect in response to custodial interrogation after he has elected to remain silent is inadmissible at trial. *Id*. at 478-79. As the Supreme Court held in *Rhode Island v. Innis*, 446 U.S. 291 (1980), this rule comes

> into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or action on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id*. at 300-01(internal footnotes omitted). An incriminating response is "any response - - whether inculpatory or exculpatory - - that the *prosecution* may seek to introduce at trial. *Id*. at 301 n.5 (emphasis in original). Police may not, however, "be held accountable for the unforeseeable results of their words or actions[,] *id*. at 302, and to constitute an interrogation their conduct "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id*. at 300.

Respondents contend that this was a "casual conversation" consisting of "open ended questions posed to [Saranchak] as part of a conversation not an interrogation." (Doc. 22 at 31.)  They emphasize that Ms. Garber was not attempting to elicit incriminating statements from Saranchak.  The Supreme Court made clear in *Innis*, however, that "the definition of interrogation can extend only to words or actions on the part of [government officers] that they *should have known* were reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 302 (emphasis in original).

The Pennsylvania Supreme Court rejected Saranchak's claim here, in part, by distinguishing *Commonwealth v. Ramos*, 532 A.2d 465 (Pa. Super. 1987). *Saranchak-5*, 866 A.2d at 506-08.  In *Ramos*, the defendant was subjected to questioning by a CYS caseworker while incarcerated and without appointed counsel.  *Id.*, 532 A.2d at 466-67.  The Pennsylvania Superior Court relied on *Mathis v. United States*, 391 U.S. 1 (1968), in holding that the fact that a CYS caseworker may have been conducting a "good faith" civil investigation did not obviate the need for *Miranda* warnings, and, therefore, without those warnings the inculpatory statements made by the defendant to the CYS caseworker should have been suppressed.  *Ramos*, 532 A.2d at 468.

In rejecting the application of *Ramos* to this case, the supreme court noted that the CYS caseworker in *Ramos* was investigating charges relating to the incidents for which Ramos was awaiting trial.  *Saranchak-5*, 866 A.2d at 302.  The court thus concluded that "the caseworker there was very much analogous to a police officer investigating a crime." *Id*.  By making such a distinction, the court seemingly did not dispute that Ms. Garber was, in fact, a state actor.[36]  Rather, the

---

[36] Nevertheless, this court notes that in *Robison v. Caterbury Village, Inc.*, 848 F.2d 424 (3d Cir. 1988), the Third Circuit Court of Appeals determined that a person can be a state actor

court declined to extend the rule set forth in *Ramos* to Ms. Garber because she was a government employee simply "engaging in conversation." *Saranchak-5*, 866 A.2d at 302. The court further stated:

> This case is wholly distinguishable [from *Ramos*]. Here, the CYS caseworker was concerned with the plight of [Saranchak's] children. She was a stranger to any aspect of the criminal case. Her question regarding the murders was purely conversational and was not made with the purpose of soliciting information from [Saranchak] about the crimes. If taken to its logical conclusion, [Saranchak's] argument, in essence, is that any governmental employee would be required to provide *Miranda* rights before engaging in conversation. Assuming one was in jail, this would include maintenance staff cleaning the facility, cooks preparing food and volunteers offering solace. However, our Court, in *Ramos*, did not enunciate such a broad rule and such a broad interpretation is not warranted here.

*Id*.

This court concludes that this reasoning of the Pennsylvania Supreme Court is clearly contrary to federal law in two respects. First, given the situation in which Saranchak's statement arose, it is difficult to imagine questions that are more likely to evoke an incriminating response - that is, a "statement[ ] . . . amount[ing] to 'admissions' of part or all of the offense" - than those posed by Ms. Garber to Saranchak. *Innis*, 446 at 301 n.5 (quoting *Miranda*, 384 U.S. at 476-77). Ms. Garber was in a position of considerable psychological control over Saranchak at the time she spoke to him in prison due to the very nature of her visit. Saranchak was clearly trying to make arrangements to see his children, and Ms. Garber was there for that very purpose. However, there is no question that Ms. Garber took the opportunity to raise the subject of the killings. When Ms. Garber guided the conversation from one about Saranchak's children to one about the

---

for one purpose, but not another. *Id.* at 429. "The logical determinant must be whether the actions challenged as unconstitutional are performed in the exercise of the actor's governmental or public functions, rather than in the actor's private capacity." *Id.* Given that Ms. Garber was visiting Saranchak in her capacity as a CYS caseworker in order to discuss the status of his children, it can be said that she was a state actor.

killings, she should have known that Saranchak's responses were likely to elicit an incriminating response.

Second, the supreme court's decision conflicts with *United States v. Mathis*, 391 U.S. 1 (1968). In *Mathis*, the defendant was serving a state sentence when he was visited by a Federal Internal Revenue Service agent who was investigating the defendant's tax affairs. The agent questioned him about two of his income tax returns without providing *Miranda* warnings. *Id*. at 2. There was no doubt that Mathis was the subject in the tax investigation, and that the questioning related to the returns which were the basis of the subsequent prosecution. The United States Supreme Court held that the interrogation fell within the *Miranda* rule because Mathis was in custody and was the object of a tax investigation which "frequently lead[s] to criminal prosecutions, just as the one here did." *Id.* at 4. However, the Court based its decision, in part, on its finding that "nothing in the *Miranda* opinion . . . calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody." *Id*. at 4-5. The Court refused to "narrow the scope of the *Miranda* holding by making it applicable only to questioning one who is 'in custody' in connection with the very case under investigation." *Id*. at 4. In this case, Ms. Garber was performing an investigation into placement of Saranchak's children as a result of his being held in police custody. Although the subject matter of her investigation may not have been directly related to Saranchak's criminal charges, her investigation itself was, indeed, a direct result of Saranchak's incarceration. Thus, it cannot be said that her questioning about the killings was "purely conversational." *Miranda* warnings should have been given. Consequently, the Pennsylvania Supreme Court's decision that Saranchak's claim had no arguable merit is contrary to clearly established federal law. 28 U.S.C. § 2254(d)(1).

64

### ii.    Sixth Amendment

The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. Amend. VI. Since *Powell v. Alabama*, 287 U.S. 45 (1932), the United States Supreme Court has held that the right to counsel granted by the Sixth Amendment means that an individual is entitled to the assistance of a lawyer "at or after the adversary judicial criminal proceedings - whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 688-89 (1972).

In this case, when Ms. Garber questioned Saranchak, he had been indicted and an attorney had been appointed to represent him. Clearly, then, Saranchak's Sixth Amendment right to counsel had attached at that point, and Ms. Garber should have advised him of that right. As the Supreme Court stated in *Smith*, "'[a] layman may not be aware of the precise scope, the nuances, and the boundaries of his Fifth Amendment privilege,' the assertion of that right 'often depends upon legal advise [sic] from someone who is trained and skilled in the subject matter.'" *Smith*, 451 U.S. at 471 (quoting *Maness v. Meyers*, 419 U.S. 449, 466 (1975)). Had Saranchak had assistance of counsel at the time of Ms. Garber's questioning, his counsel may have advised him of his right to not incriminate himself by answering Ms. Garber's questions. Therefore, in addition to the Fifth Amendment considerations, the court concludes Ms. Garber's questioning was also in violation of Saranchak's Sixth Amendment right to assistance of counsel.

### c.    Failure to Litigate Suppression Issues

Like his argument relating to his statements to police, Saranchak argues that by not seeking suppression of the statements made to Ms. Garber, his counsel was

so deficient as to undermine the confidence of the outcome of the proceedings.[37]
*See Strickland*, 466 U.S. at 694.  Having concluded that Saranchak's claims of
constitutional violations have arguable merit, the court further agrees with
Saranchak that counsel's performance was deficient.

At the PCRA hearing, Attorney Watkins stated that he only vaguely
remembered Ms. Garber's testimony.  However, he did testify as follows:

| | |
|---|---|
| [PCRA Counsel]: | Do you recall whether her testimony was particularly damaging - - |
| [Attorney Watkins]: | I don't recall her testimony. . . . |
| [PCRA Counsel]: | to your case?  Well, if she had testified that Mr. Saranchak told her that he was not intoxicated at the time of the killings, would that have been in your mind pretty damaging to your case? |
| [Attorney Watkins]: | Yes. |
| [PCRA Counsel]: | And do you recall that she also mentioned that Mr. Saranchak had told her about a prior burglary that he had committed at some point? |
| [Attorney Watkins]: | That part I don't recall. |
| [PCRA Counsel]: | Okay.  And if she had testified to that at the degree of guilt hearing but more specifically in the sentencing hearing before the jury, isn't that something that you would have thought was harmful? |
| [Attorney Watkins]: | Yes. |
| [PCRA Counsel]: | Okay.  Did you ever object to Miss Garber's testimony? |
| [Attorney Watkins]: | That's a matter of record.  I don't know. According to what you said, I should have. |

* * *

---

[37] The court addresses the question of prejudice *infra*.

| [PCRA Counsel]: | And I assume too that goes with whether you ever sought a motion *in limine* to try to keep her from talking about any prior crimes or not, if the record shows that that didn't happen? |
| [Attorney Watkins]: | Right, it didn't happen. |
| [PCRA Counsel]: | And it probably should have? |
| [Attorney Watkins]: | Yes. |

(PCRA NT 83-85.)

Neither the PCRA court nor the Pennsylvania Supreme Court addressed whether counsel's performance was deficient in failing to litigate a suppression issue with respect to statements made to Ms. Garber.  Consequently, this court's review of the deficient performance prong of *Strickland* is *de novo*.  *See Appel*, 250 F.3d at 210.

After reviewing counsel's testimony, the court concludes that counsel's performance here was deficient.  Like the issue of failing to seek suppression of Saranchak's statements to police in light of a plea of guilty to criminal homicide generally, set forth above, Attorney Watkins' understanding of the law relating to suppression here was wrong.  *See supra* pp. 55-56.  In addition, Attorney Watkins' testimony at the PCRA hearing indicates that he believed this claim to have merit, and that he had no strategic or tactical reason for failing to litigate such a claim. Because counsel had no reasonable strategy for failing to raise this meritorious issue of suppression of Saranchak's statements to the CYS caseworker, the court concludes that counsel's performance was constitutionally deficient.

### 3.   **Cumulative Prejudice**

Ineffectiveness of counsel permeated every issue set forth above.  Counsel failed to seek suppression of Saranchak's statement taken by police in violation of his *Miranda* rights.  The CYS caseworker should have provided Saranchak with

proper warnings before interrogating him about the killings; counsel did not seek to suppress her testimony. Examining the impact of these errors in the aggregate, the court concludes that counsel's conduct fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 689, 695-96; *see also Lindstadt*, 239 F.3d at 204.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. In order to merit habeas relief, "the defendant must show that the deficient performance prejudiced the defense." *Id*. at 687. The "prejudice" component of the *Strickland* test focuses on "the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citing *Strickland*, 466 U.S. at 687). The level of prejudice the defendant must demonstrate lies between prejudice that "had some conceivable effect" and prejudice that "more likely than not altered the outcome of the case." *Strickland*, 466 U.S. at 693. Therefore, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The Supreme Court has defined "reasonable probability" as one that "undermine[s] confidence in the outcome." *Id*.

In the present case, the Pennsylvania Supreme Court relied only on the "overwhelming evidence of [Saranchak's] guilt," to conclude that Saranchak was not prejudiced by Attorney Watkins' failure to pursue the suppression of Saranchak's initial statements to police. *Saranchak-5*, 866 A.2d at 301. *See Lindstadt*, 239 F.3d at 204 ("Even serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming

68

evidence of guilt.").  However, this "overwhelming evidence of guilt" was the very evidence this court finds would have been suppressed or stricken had his counsel been effective.  Because Saranchak has established that counsel's deficient performance with respect to this evidence deprived him of certain rights under both the Fifth and Sixth Amendments, this court concludes that counsel's performance has rendered the results of both phases of Saranchak's trial unreliable.

In sum, Saranchak has demonstrated that his counsel's services fell "outside the wide range of professionally competent assistance" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 689. Accordingly, the state court's decision to deny Saranchak's claims here for relief on the ground that he was afforded ineffective assistance of counsel "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

## IV.   <u>Conclusion</u>

For the foregoing reasons, the court will grant habeas corpus relief on Saranchak's claim of ineffective assistance of counsel during the guilt phase by failing to investigate, discover, and present evidence to support a diminished capacity defense to the murders of Stella and Edmund Saranchak (Claim I).  The court will also grant habeas corpus relief on Saranchak's claims of ineffective assistance of counsel during the guilt phase for failure to litigate certain suppression issues (Claims II-III).  The proper relief in this case is to grant the

writ, vacate Saranchak's conviction, and allow the Commonwealth of Pennsylvania to retry Saranchak within a reasonable time of the accompanying order.

An appropriate order follows.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  January 4, 2008.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DANIEL SARANCHAK,** | : | **CIVIL NO. 1:CV-05-0317** |
| **Petitioner** | : | |
| **v.** | : | **(Judge Rambo)** |
| **JEFFREY BEARD, Commissioner,** | : | |
| **Pennsylvania Department** | : | |
| **of Corrections;** | : | |
| **DAVID DiGUGLIELMO,** | : | |
| **Superintendent of the State** | : | **THIS IS A CAPITAL CASE** |
| **Correctional Institution at** | : | |
| **Graterford; and FRANK TENNIS,** | : | |
| **Superintendent of** | : | |
| **the State Correctional Institution** | : | |
| **at Rockview,** | : | |
| **Respondents** | : | |

## ORDER

Upon consideration of the petition for writ of habeas corpus (Doc. 7), the complete record in this case, and the reasons set forth in the accompanying memorandum, it is hereby **ORDERED** that:

1. The petition for writ of habeas corpus (Doc. 7) is **GRANTED** as to Petitioner's claims I-III;

2. Petitioner's convictions for first degree murder and related charges in *Commonwealth v. Saranchak*, Nos. 889-1193 & 889A-1993, September Term, 1994 (Cyrus P. Dolbin, J.), are **VACATED**;

3. The execution of the writ of habeas corpus is STAYED for 180 days from the date of this order, during which time the Commonwealth of Pennsylvania may conduct a new degree of guilt hearing;

4. In accordance with 28 U.S.C. § 2253(c)(2) and M.D. Pa. L.R. 83.32.2, a certificate of appealability is **GRANTED** on Petitioner's claims;

5.  If either party files an appeal to the United States Court of Appeals for the Third Circuit, this order will be stayed pursuant to M.D. Pa. L.R. 83.32.2.


s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  January 4, 2008.